**BANK OF DEARBORN, Plaintiff,**

v.

**James J. SAXON, Comptroller of the Currency, & Manufacturers National Bank of Detroit, Defendants.**

**Civ. A. No. 23628.**

United States District Court
E. D. Michigan, S. D.
July 12, 1965.

Wilber M. Brucker, Wilber M. Brucker, Jr., Detroit, Mich., for plaintiff.

Carson C. Grunewald, of Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., for defendant Manufacturers Nat. Bank.

Richard S. Beatty, Dept. of Justice, Washington, D. C., John Shepherd, Asst. U. S. Atty., Detroit, Mich., for defendant James J. Saxon.

TALBOT SMITH, District Judge.

This case involves a conflict between a state bank, the Bank of Dearborn, a state banking corporation, a national bank, the Manufacturers National Bank of Detroit, a national banking association, and the Comptroller of the Currency, Mr. James J. Saxon. The controversy is over branch banking.

In the City of Dearborn, Michigan, a new shopping center (Westborn) had been built. Its location was near the intersection of West Michigan Avenue and Outer Drive in the City of Dearborn. Michigan Avenue, the principal business artery of Dearborn, has two commercial focal points. One, the older, is around

Mason and Oakwood Avenues, the other, the more recent, is in the area of the Westborn Shopping Center. The latter was characterized in the testimony as "a tremendous drawing factor" with respect to commercial business.

The defendant Manufacturers Bank had a branch near the intersection of Michigan and Mason Avenues in Dearborn, in or near the older commercial center. It had no branch within a mile of the new commercial center, near Westborn Shopping Center, but, being aware of the business potential of the area, was desirous of having a branch at West Michigan Avenue and Outer Drive. The difficulty with the establishment of a new branch in this area was that it was forbidden by state law. It was known by the defendants that a new branch could not legally be established at the West Michigan and Outer Drive location. This is due to the fact that under Michigan law "no such branch [could] be established in a city or village in which a state or national bank or branch thereof is then in operation."[1] And here, in the City of Dearborn, there was not one but were four branches of the state Bank of Dearborn already in operation. Consequently the following plan to place a branch in the desired location was devised by the officials of the defendant bank and acquiesced in and knowingly implemented by the Comptroller: One of the defendant bank's branches (hereafter called the Carlysle branch) would be "relocated" a short distance away, across the city line, in the township. This would be done at once, for the area's incorporation as a city was in process, after which defendant bank could not establish there a branch. Since this would "theoretically" (such is the terminology found in defendant Saxon's files)[2] be a new branch (we will call it the Dartmouth branch hereafter) it would leave the old one free to "move" (according to defendants) to the area of the new shopping center.

Thus the "technically" new branch would retain substantially all of the business of the old branch, leaving the old one free to "move" into the new Westborn shopping area, where it could not lawfully have been established in the first place, because of the fact (as defendant bank put it) that "Existing antiquated state banking regulations will not permit us to open another branch in the City of Dearborn."[3]

Defendants urge to us that these were two separate and independent transactions, each act legal [which plaintiff denies], each to be considered on its own merits. The argument is belied in clearest terms by the record. The defendant bank considered the two proposals together, successively, and its own resolutions made the "move" to the shopping center area "contingent upon" the establishment of the Dartmouth branch. The applications for certificates were made the same day. They were investigated together and reported upon together. Far from being bona fide separate transactions, each treated on its own merits, the proposals were interrelated, intertwined, and interdependent. Mr. Lutz

---

1. C.L. Michigan 1948, § 487.34, Stat.Ann. 23.762.

2. "Since the proposed bank theoretically will replace the Telegraph-Carlysle branch, the proposed branch will be on a paying basis immediately". Excerpt from report of Mr. Joseph C. Lutz, Chief National Bank Examiner, Chicago, to defendant Saxon.

3. Summary of information submitted by Manufacturers Bank to defendant Saxon on December 10, 1962. The paragraph in full reads as follows: "Existing antiquated state banking regulations will not permit us to open another branch in the City of Dearborn. Therefore, we propose to establish a new branch in the unincorporated village outlined in Dearborn Township for which this application is made. The customers of the already successful Telegraph-Carlysle office would be transferred to the proposed new office, which will offer larger and more modern quarters, in the vicinity of Telegraph and Lehigh. The new branch would obviously be profitable immediately. Then we propose that the existing Telegraph-Carlysle office be closed and moved to Michigan Avenue and Outer Drive."

himself, the Chief National Bank Examiner, Chicago, in commenting upon the proposals to defendant Saxon described them as a "package proposal" [4] which, in truth, they were. Looking at the realities of the situation, there was never any intention on the part of anyone that the "new" Dartmouth branch would be other than a simple move of the Carlysle branch a short distance down the street, within the same economic area of small homes and modest businesses. In fact, in answer to a request of the Comptroller for an estimate of the deposits and loans of the new Dartmouth branch, the defendant bank furnished, to the penny, the corresponding figures for the Carlysle branch. Nor do we overlook the defendant bank's representations to defendant Saxon that the "customers of the already successful Telegraph-Carlysle office would be transferred to the proposed new office, which will offer larger and more modern quarters, in the vicinity of Telegraph and Lehigh. The new branch would obviously be profitable immediately." Even conceding defendant's elaborate explanation that what they really meant by this was that all of the customers themselves who wanted or desired to transfer would be allowed by the bank to transfer, the statement made is revealing as to the intent and expectations of the parties. What was intended was a move. The business of the Dartmouth branch, Mr. Lutz reported to defendant Saxon "will come

from customers formerly served by that [Carlysle] branch.[5]

So far as the alleged "move" of the Carlysle branch to the new shopping center area is concerned, again we have a mis-labeling. Although the word "move" is not defined in the statutes its meaning in banking circles is well established. It means the actual physical transport of the usable equipment and the customer account records from the old location to the new, so far as is reasonably compatible with the new location and the possibly newly-constructed building. At least it means taking the bulk of the customer's accounts along. This was not the contemplation here and the defendants frankly recognized it. In fact there is in the record much speculation as to how many of the Carlysle customers would go to the new shopping center area to bank. Percentage estimates varied, depending upon whether the plaintiff's witnesses or the defendants' were testifying. But the mere fact that defendant was concerned, in its planning, over how many of its customers would go with it to its new location was both significant and revealing. There was something here other than a mere move. It was the establishment of a new branch in a substantially different area. Since the new location was some distance from the old, and in a predominantly commercial rather than an area of residential-small business, the defendant bank was concerned as to how

4. "This request [the 'move' to the new shopping center area] represents part of a package proposal which includes an application to establish a new branch in the vicinity of South Telegraph Road and Lehigh Street [the Dartmouth branch], Dearborn Township, Wayne County, Michigan."

5. "The proposed branch is to be located 4 miles south of the existing Telegraph-Carlysle branch, and the banking business now at that branch is to be transferred to the new location. Accordingly, the banking desirability of the entire area to be served is well established and this move should have little or no effect upon competitive banking facilities. The establishment will provide more ade-

quate banking services to present as well as new customers. Business at the Telegraph-Carlysle branch has outgrown its present quarters, and it is proposed that this branch be moved to a new location in the vicinity of Michigan Avenue and Outer Drive in the City of Dearborn, Michigan near the Westborn Shopping Center."

"As indicated herein the existing Telegraph-Carlysle branch is to be moved to another location and in general business of this proposed new branch will come from customers formerly served by that branch. The existing facility is overcrowded and inadequate and the establishment of this branch will enable the bank to better serve the area."

many of its old neighborhood customers would make the trip into the new area with it. Cutting through the various percentages tendered and getting to the core of the matter, it is perfectly clear that the defendant bank expected most of its old neighborhood customers to stay in the neighborhood with the Dartmouth branch, not to travel with it on its "move". Defendant Saxon was aware of all of this. The Summary of Information furnished him pointed out the tremendous business potential of the expanding area in this part of Dearborn, stating, in fact, that the market area for the new branch would be extensive and that the proposed branch "would serve to a certain extent as an adjunct to [the old Michigan-Mason] office."

The Lutz report to defendant Saxon also makes it clear why the defendant bank wanted a new branch in this area and where its business was to come from.

> "The center is well situated near main thoroughfares and unquestionably a bank located in the immediate vicinity of the center would be positioned to generate added business and offering the public added banking convenience. Applicant's Michigan-Mason branch is a very successful branch office. However, it is located one mile distance from this proposed relocation site and thus is not positioned to conveniently serve the banking needs of the activity near the Michigan Avenue-Outer Drive intersection nor the public employing the facilities of this comparatively new commercial development. It is believed that the overall program proposed by the Manufacturers National Bank of Detroit which includes the establishment of a new branch in Dearborn Village, the relocation of its Telegraph-Carlysle branch as indicated above, is sound and should prove of benefit not only in offering added convenience to the public but in generating added banking business profitable to applicant."

Obviously we have here a completely new operation, not the simple move of a neighborhood branch. That had already taken place, down the street from Carlysle to Dartmouth. This was a venture into new and more lucrative fields. And here it is that the defendants run foul of the law. Maybe the laws should be amended to permit the utmost flexibility in branch banking. Maybe they should not. Congressional debate on this issue has gone on for years. But it is not for defendant Saxon and defendant bank to amend our "antiquated" laws by clever devices of evasion, covered by a broad grant of discretion and cloaked under the privileges of the executive branch of government.

It is abundantly clear that what was described as a move, was, in fact, the location (near the new shopping center) of a new branch, and that what was described as the establishment of a new branch was actually merely a move from (Carlysle to Dartmouth).

We now proceed from the factual situation to the meaning of the various statutes involved with respect to the moving of branches. Defendant Saxon takes the position " * * * that 12 U.S.C. 36(c) incorporates no requirement that the Comptroller follow the provisions of State law with respect to the removal of 'outside' branches and that as no such restrictions are placed on the exercise of his discretion in this respect, his determinations are not subject to judicial review." Moreover, he adds, his files enjoy an executive privilege against disclosure. In addition he contends that "even if the law of Michigan were applicable to branch moves of national banking associations, the move challenged in this suit would * * * be legal."

We will first address ourselves to the last argument made. Plaintiff has contended that the Michigan Financial Institution Act does not authorize the moves of "outside" branches under any circumstances. Section 34 of such Act, relating

tᴏ branches. (M.S.A., Sec. 23.762, C.L. 1948, Sec. 487.34) reads as follows:

"Sec. 34. Any bank having a capital of at least $50,000.00 may, with the written approval of the commission, establish and operate a branch or branches within a village or city other than that in which it was originally chartered: Provided, That the village or city in which it is proposed to establish and operate a branch is located in the same county in which the parent bank has its principal office or, if not in said county, then within 25 miles of said parent bank or in a contiguous county at a point more than 25 miles from the parent bank, if such county has no bank: Provided, further, That no such branch shall be established in a city or village in which a state or national bank or branch thereof is then in operation: Provided further, That the commission shall not grant such approval unless the parent bank has capital and surplus in an amount at least equal to the aggregate minimum capital and surplus, respectively, required for the establishment of a bank in each of the various places where such bank and its branches are to be located and unless the commission is satisfied as to the sufficiency of the capital and surplus of the bank, the necessity for the establishment of such branch or branches and the prospects of successful operation if established.

"Any bank may, with the written approval of the commission, establish and operate a branch or branches within the limits of the city or village in which said bank is located: Provided, That the commission is satisfied as to the necessity for the establishment of such branch and the prospects of successful operation if established. No branch of any such bank shall be moved from 1 location to another within the same city or village without the written approval of the commission."

■■ It is obvious that the above statute is not without its ambiguities. The first paragraph, which deals with outside branches, says nothing of moves. The only reference to moves is found in the second paragraph, which deals with inside branches. It might thus be argued, as plaintiff has done, that there is no authority whatever to move branches other than inside branches. The court, however, cannot agree. It will be noted that the precise language of the two paragraphs relating to branches is not the same, the first using the words "no such branch", the second "[n]o branch of any such bank [shall be moved without permission]". Had the latter proviso been incorporated in a separate paragraph, there could be no doubt in the court's mind that the words "any such bank" referred back to the bank described at the outset of Section 34, a bank having certain capital. Despite the lack of separate paragraph, however, it is our judgment that the last sentence of the above quoted Section 34, authorizing branch moves, has reference to "such bank" rather than "such branch". A contrary interpretation is, we feel, not only contrary to the plain language but also to the purposes of the act. The state banking commissioner, in fact, has authorized the moves of "outside" branches in Michigan for many years, and while consistent administrative interpretation is not binding upon us, it nevertheless is persuasive. We conclude, therefore, that under the Michigan Financial Institution Act, the moves of outside branches are permitted, but only under the restrictions therein imposed.

We turn, then, to the requirements of National Bank Act (12 U.S.C. § 21 et seq.).

In earlier days, (prior to 1927) national banks were forbidden to branch.[6] It was the McFadden Act of 1927 which first authorized branching, and this was with

---

6. First National Bank in St. Louis v. State of Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1923).

reference to what are called in banking circles "inside" branches, namely, branches in the same city as the main office, as opposed to "outside" branches, those outside the city. (We are here dealing with an outside branch.) The authority granted was severely restricted. Inside branches might be established and operated if they were "at the time permitted to State banks by the law of the State in question". Here we see for the first time the dependence upon state law, which is one of the primary issues in this case, and which dependence is denied by the Comptroller. It is of significance to our interpretation of the law that the precise issue here argued by the Comptroller (namely, his independence of state law) was also urged to the Congress at this time and rejected. 76 Cong.Rec. 1998–2026 (1933). See, also, Chapman and Westerfield, Branch Banking, 102–108, 118–20 (1942).

We find also in the McFadden Act, for the first time, a section relating to the moving of branches, the proviso being contained in the following words: "No branch of any national banking association shall be established or moved from one location to another without first obtaining the consent and approval of the Comptroller of the Currency." Sec. 36 (e).

■ The intent of Congress in 1927 was clear. National banks might establish and operate "inside" branches, subject to the approval of the Comptroller. (The establishment of "outside" branches came later.) It is also clear, in our judgment, that the authority to move branches (referred to in Sec. 36(e) above) was considered to be merely incidental to the establishment thereof. The "moving" authority is to be implied from Sec. 36(c), which section refers back to and is subject to the state law. The National Bank Act was amended in 1933. At that time clause (2), Sec. 36 (c), was added, reading as follows: [6(a)]

"(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State or State banks. In any State in which State banks are permitted by statute law to maintain branches within county or greater limits, if no bank is located and doing business in the place where the proposed agency is to be located, any national banking association situated in such State may, with the approval of the Comptroller of the Currency, establish and operate, without regard to the capital requirements of this section, a seasonal agency in any resort community within the limits of the county in which the main office of such association is located, for the purpose of receiving and paying out deposits, issuing and cashing checks and drafts, and doing business incident thereto: Provided, That any permit issued under this sentence shall be revoked upon the opening of a State or national bank in such community. Except as provided in the immediately preceding sentence, no such association shall establish a branch outside of the city, town, or village in which it is situated unless it has a com-

---

6(a). "Second sentence inserted in 1935 by ch. 614, § 305, 49 Stat. 708; entire quoted text reading as finally amended in 1962. 12 U.S.C. § 36."

bined capital stock and surplus equal to the combined amount of capital stock and surplus, if any, required by the law of the State in which such association is situated for the establishment of such branches by State banks, or, if the law of such State requires only a minimum capital stock for the establishment of such branches by State banks, unless such association has not less than an equal amount of capital stock."

It will be observed in the above statutory enactment that the law of the state involved is to be determinative as to the problem of branching. National Banks were given the same opportunity for branching as state banks, thus perpetuating the dual banking system. Section 36(e), however (upon which defendant Saxon bases his argument that he has plenary power to authorize moves of national bank branches regardless of state law) was not amended in 1933. It seems clear that section 36(e), upon which the defendant Comptroller relies, does not in truth grant him any plenary power to authorize moves of branches without regard to the provisions of the law of the state in question. He has the authority to move branches, but, as we noted with respect to the 1927 law, such authority stems from section 36(c) by way of implication (since it is nowhere affirmatively expressed) and 36(c), as has been seen, specifically refers to it as being based upon the state law.

The Comptroller, it is true, has a broad discretion with respect to the matters committed to his charge, including moves of branch banks. In this regard, he urges that the exercise of his discretion under these facts is not subject to judicial review, nor, in fact, are his files subject to scrutiny. Actually what he is arguing for is the complete invulnerability of his decisions. If, indeed, it were true that his admittedly broad discretion were combined with his doctrine of unreviewability of the exer-

cise of his discretion, plus the complete secrecy of his files relating thereto, a constitutional question of the first magnitude would be presented, since the possessor of such powers would be unassailable in any court by any process. We are aware of no such sanctuary in American constitutional law, nor do we believe that the Congress ever sought to confer it.

As to the review of discretion it is our judgment, which we think requires no elaboration, that the Administrative Procedure Act (T. 5 U.S.C. §§ 1001, 1009) authorizes such review.[7] The matter is analyzed in Community National Bank of Pontiac v. Saxon, 6 Cir., 310 F.2d 224 (1962); First National Bank of Smithfield v. First National Bank of Eastern North Carolina et al., 232 F. Supp. 725, 729 (E.D.N.C.1964); Commercial State Bank of Roseville v. Gidney, D.C., 174 F.Supp. 770 (1960); Commercial Security Bank v. Saxon, 236 F. Supp. 457 (D.C.D.C.1964); Whitney National Bank v. Bank of New Orleans & Trust Co., 116 U.S.App.D.C. 285, 323 F.2d 290 (1963); Peoples Bank—Trenton v. Saxon, 244 F.Supp. 389 (E.D.Mich. 1965) (Civil Actions Nos. 26166 and 26167.)

The Secretary of the Treasury has made to this court a formal claim of privilege with respect to the Comptroller's files. The high office of the claimant, plus the respect to be accorded a coordinate branch of Government impels us to a rather more full discussion of this problem than we would otherwise undertake. Privilege, of course, is a doctrine of concealment. It means that materials relevant to the issue in court are, for some reason paramount to the administration of justice, to be hidden from disclosure. It is not to be construed beyond its necessary application. The issue presented is one of the most challenging of the contemporary legal issues, namely, the conflict between an administrative agency clothed with broad discretionary powers and a citizen who as-

7. See, Berger, Administrative Arbitrariness and Judicial Review, 65 Col.L.Rev. 55 (1965).

serts that he has been injured by their arbitrary use. Conflicting and important considerations are present. We exclude from discussion, at the outset, such issues as state or diplomatic secrets, identity of informers, and technical developments in the fields of arms and ordnance. We are faced with none of these, and the authorities as to privilege with respect thereto have no binding significance. What we really have here is the executive's claim of privacy, of freedom from disclosure of inter-office reports and memoranda, on the ground that public officers would be hampered in the performance of their duties if such materials were open to public scrutiny.[8]

This question cannot be resolved in the abstract. The merits of the particular matter before the court must be considered, the necessity of disclosure weighed against the need for privacy in the light of the circumstances disclosed. Here we have a claim of subterfuge, of sham, of the use of devices bordering on fraud whereby, it is alleged, the Comptroller's office sought to cloak an illegal act in the habiliments of legal propriety and good faith. It is asserted that the device employed is so patently an evasion of our law that the files themselves cannot fail to disclose it. A *prima facie* case was, in fact, made out early in our proceedings. At times circumstances are such as to challenge the conscience of the Chancellor. Thus if, in the teeth of the Michigan statutes forbidding a saloon to be established near a house of worship, we were to be confronted with a certificate so authorizing, our interest and our conscience would at once be aroused. Similarly here. Michigan's statutes clearly forbid the establishment of a new branch at this new shopping center location. By what authority does the Comptroller override these statutes? Did he properly exercise his discretion, or did he abuse it? In reply we are told, in part, that we may not scrutinize his files to determine whether or not his discretion was exercised in accordance with the law.

The Secretary of the Treasury tells this Court, in his claim of privilege, that the disclosure of "opinions expressed by employees relating both to the legality and desirability in approving the branch removal application" would be, in his words, "injurious to the public interest." We have difficulty with this representation upon the facts before us. If there were a new weapon of national defense here, the details of which were sought, if private advices to one of our ambassadors were to be revealed, or if an informant were to be named to the press and public, the public interest in nondisclosure would be clear, as against we would be required to weigh the private interest asserted. But at the time this formal claim of privilege was made in this matter a *prima facie* case of sham and subterfuge had been made out. It would seem that the real public interest under such circumstances is not the agency's interest in its administration but the citizen's interest in due process. Indeed it might be said with considerable force that the issue before us, a charge of sham and subterfuge employed by those in high places, is the very kind of issue with respect to which an aggrieved administrator might well insist that his entire file in the matter under scrutiny (save for what might properly be called business secrets) be spread on the public record so that the falsity of the charge might be made manifest of all who cared to read. This the Administrator, however, has refused to do.

The authorities do not support the application of the privilege claimed to the facts before us. This is not the frivolous claim of an idle mischief maker.

8. For policy considerations involved see Berger and Krash, Government Immunity from Discovery, 59 Yale L.J. 1451: Isham, Discovery of Information in Possession of Government Agencies and Bureaus over a claim of privilege by the Government, 13 Ohio St.L.J. 270; Sanford, Evidentiary Privileges Against the Production of Data Within the Control of Government Departments, 3 Vand. L.R. 73.

This is a citizen who has presented sufficient facts to warrant searching inquiry. There is no doubt that official records have a degree of sanctity, but it is not absolute. It was Mr. Justice Reed, retired, sitting in the Court of Claims, who gave the most exhaustive exposition of the privilege here sought to be availed of, but he was careful, in his opinion, to differentiate the very situation with which we are now confronted. In upholding the privilege he not only pointed out that the case before him involved "recommendations and advice on program policy", as distinguished from "operative events", but observed, as well, that "No fraud is charged, no duality of interest, only a breach of the terms of open contracts." [9] Here, the charge of fraud, by its more polite synonyms, sham and subterfuge, is the gravaman of the complaint. And, so far as the Comptroller's claim of privilege may involve a prohibition against probing his mental processes, we agree with the Fourth Circuit that "the mental process rule is but 'one facet of the general presumption of regularity' which attaches to decisions of administrative bodies, 2 Davis, Administrative Law (1950), § 11.06, 0.63" and that where a *prima facie* case of misconduct is shown, "justice requires that the mental process rule be held inapplicable," citing among other authorities, Union Savings Bank of Patchogue, New York v. Saxon, D.C., 209 F.Supp. 319 (1962).[10]

The claim of privilege so made we have in part respected and in part denied. We have found it unnecessary to disclose to a curious banking and business world the dollar amounts of deposits, and loans, and similar matters in the branches reported upon in the files. But in another area we have denied the privilege. This is in the area of the legal justification for what was here done, its reasons and its motivations. To say that an administrator has discretion does not mean that he can act without reason,

that he may grant or withhold his approvals as his uncontrolled caprices may dictate. No official in our system of Government has a power so awesome. Thus we have inquired into the administrator's employment of his powers. Having so done, the whole plan (which we have heretofore described) becomes clear. He has abused his discretion. Our permanent injunction will follow.

Decree may be presented.

9. Kaiser Aluminum and Chemical Corp. v. United States, 157 F.Supp. 939, 947, 141 Ct.Cl. 38 (1958).

10. Singer Sewing Machine Co. v. N. L. R. B., 329 F.2d 200, 208 (4th Cir., 1964).