The **FIDELITY TRUST CO.**, Plaintiff,
and
The State National Bank of Connecticut,
Plaintiff-Intervenor,

v.

**Walter B. CAMP**, Comptroller of the Currency of the United States, et al.,
Defendants.

Civ. No. B-39.

United States District Court,
D. Connecticut.

Feb. 14, 1972.

T. Ward Cleary, Frederick M. Tobin, Curtis, Brinckerhoff & Barrett, Stamford, Conn., for plaintiffs.

Stewart H. Jones, U. S. Atty., Richard L. Winter, Asst. U. S. Atty., New Haven, Conn., for defendant William B. Camp.

Frederick L. Comley, Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., for defendant Connecticut Nat. Bank.

Joseph P. Zone, Zone & Bernstein, Stamford, Conn., for defendant Atlantic Nat. Bank.

## MEMORANDUM OF DECISION

ZAMPANO, District Judge.

In this action, filed pursuant to 5 U. S.C. Chapter 7, the plaintiffs, The Fidelity Trust Company (Fidelity) and The State National Bank of Connecticut (State National), seek judicial review of a final decision of the Comptroller of the Currency. More specifically, they request declaratory and injunctive relief: 1) adjudging that the certificate of approval issued by the Comptroller to the defendant, The Atlantic National Bank (Atlantic National), for permission to establish a branch bank in Stamford, Connecticut, was invalid and illegal, 2) ordering that the Comptroller revoke the certificate, and 3) enjoining Atlantic National and the defendant, The Connecticut National Bank (Connecticut National) from acting under the authority of the certificate.

## FINDINGS OF FACT

1. Plaintiff Fidelity is a state bank organized under the laws of the State of Connecticut, with its principal office located at 129 Atlantic Street in Stamford, Connecticut. It has five bank

branches in Stamford, and one in Darien, Connecticut.

2. Plaintiff State National is a national bank organized under the banking laws of the United States, with its principal office in Bridgeport, Connecticut, and with 38 branches, seven of which are in Stamford.

3. Defendant Atlantic National is a national bank with a home office and two branches in Stamford.

4. Defendant Connecticut National is a national bank with a home office in Bridgeport and 42 branches located throughout Connecticut. However, it had no branches in Stamford.

5. The plaintiffs and defendants are banking competitors.

6. On July 28, 1969, the boards of directors of Atlantic National and Connecticut National approved an agreement of merger pursuant to which the merged banks would operate under the charter and name of Connecticut National.

7. On November 5, 1969, Atlantic National applied to the Comptroller of the Currency for permission to establish another branch bank in Stamford, at 65 Washington Avenue.

8. On December 2, 1969, the stockholders of Atlantic National and Connecticut National voted to approve the merger agreement between the two banks.

9. On December 8, 1969, Connecticut National requested the Comptroller to approve the merger.

10. Throughout this period of time Atlantic National continued to pursue approval of the proposed Washington Avenue branch.

11. The Comptroller's Administrative File reveals that an investigation was conducted of Atlantic National's application for a branch bank and a National Bank Examiner reported, among other things, that:

(a) This proposed office is stated necessary to provide the bank with an outlet within the commercial center of Stamford. The present head office and branches are suburban in character and do not serve their customers in the business community. Growth prospects are expected to be enhanced by the ability to provide service convenience to present and future customers.

(b) Competitor banks are located almost adjacent to each other, none being more than a two minute walk from the furthest competitor.

(c) The new location is in the heart of a rapidly changing commercially bent area. New construction, new business and general development are proceeding almost daily with the result that more and more of the bank customer public is either living or working within the immediate vicinity.

(d) The need for a central branch location in the business core of Stamford will be satisfied. The City of Stamford is undergoing a period of change which will make this a highly advantageous location. Urban Renewal in the center of Stamford is impressive in its described completion. The bank has proven the ability to be competitive with the larger institutions. There is an impending merger decision which will, if rendered favorably, block future branching under the anti-competitive home rule law.

(e) No unfavorable factors were determined to exist.

(f) I believe this bank has proven to be a stimulating competitor fully capable of operating this branch independently without consideration of the pending merger decision. The area is prospectively good. No weak or extended institution is present in the community. I recommend approval.

12. On February 12, 1970, the Regional Administrator of National Banks

summarized his investigation and recommendations as follows:

The Applicant desires a proposed branch in order to obtain a location situated within the recognized confines of the Stamford Financial District. This outlet would also enable the Applicant to better serve existing customers in the downtown area and add much to the image of the bank as a full-service operation. The present location is in an area which is now under substantial redevelopment and reconstruction which is changing the commercial center in the downtown district.

The Applicant converted from a Morris Plan bank in 1966. In the intervening years, it has doubled in size. Due to its inherited liberal lending policies, its condition has always been rated fair, with moderately heavy classified, a large volume of delinquencies and numerous operating problems common to a conversion to a commercial bank operation. In the interim, it has been established two *de novo* branches. Its shareholders have readily augmented capital when requested by this Office. Its management is regarded as fair. The officers have average talent, executive officers are overworked, and four of the directors draw salaries as officers, but do make a major contribution. Earnings are below average for this size institution due to high cost of operations. While it is recognized that the Applicant has never been located in the commercial center of the city, it appears that this application was filed in anticipation of the approval and consummation of the Applicant's pending merger into The Connecticut National Bank, Bridgeport, Connecticut. The State's Branching Statutes would prohibit any further branching in the city by the Resultant Bank.

The protest of the Stamford Fidelity Bank and Trust Company has considerable merit and should be considered. The fact that the Applicant believes that it would not be able to establish the branch until December, 1970 indicates the inability of the Applicant to find an alternate site for a temporary location. Notwithstanding the pending merger and the protest, it is respectfully recommended that the application of The Atlantic National Bank, Stamford, Connecticut, to establish a branch to be located at 65 Washington Avenue, Stamford, Fairfield County, Connecticut, be approved.

13. On February 27, 1970, the Comptroller's Office approved Atlantic National's application to establish a branch at 65 Washington Avenue in Stamford.

14. On March 3, 1970, the Comptroller (acting through the Acting Comptroller) issued a decision approving the merger of Atlantic National into Connecticut National. He concluded that:

Consummation of the proposed merger should enhance future banking competition in the Stamford area. Under Connecticut's home office protection statute the charter bank could not establish a *de novo* bank in Stamford. The effect of the proposed merger will be to substitute branches of a large aggressive bank for a bank with a limited competitive capacity.

Consummation of the proposed merger will serve the convenience and needs of the Stamford community. Present customers of the merging bank will be benefitted [sic] by having their checking accounts computerized. Additionally, the charter bank will provide a qualified and experienced trust department, services of a well developed commercial credit department, a vastly increased lending limit and other services not now available to customers of the merging bank.

Applying the statutory criteria to the proposed merger, we conclude that it is in the public interest and the application is, therefore, approved.

15. On March 6, 1970, Atlantic National applied to the Comptroller for permission to change the location of the branch from 65 Washington Avenue to 60 Washington Avenue in Stamford.

The Comptroller approved the temporary branch on March 17, 1970.

16. On March 26, 1970, Fidelity instituted this action.

17. On March 30, 1970, the branch at 60 Washington Avenue was opened and in operation.

18. On May 18, 1970, State National intervened as a party plaintiff.

## QUESTIONS PRESENTED

1. Was there a merger between Atlantic National and Connecticut National prior to the date the new branch bank opened for business?

2. Should the Comptroller have granted approval for the branch bank in view of the impending merger?

3. Did the Comptroller act illegally, arbitrarily, and in abuse of his discretion?

## CONCLUSIONS OF LAW

1. Jurisdiction of this Court is properly invoked pursuant to 5 U.S.C. Chapter 7.

2. The merger between Atlantic National and Connecticut National did not predate the opening of the Washington Avenue branch bank.

3. The Comptroller's approval of the branch bank did not violate any state or federal laws.

4. The Comptroller's actions were not arbitrary, capricious or an abuse of his discretion.

5. The plaintiffs' motion for summary judgment must be denied; defendants' motion for summary judgment is granted.

## DISCUSSION

The parties agree that there are no triable issues of fact and that the matter should be disposed of by way of summary judgment. Rule 56, F.R.Civ.P.

■ At the outset, it is important to note that the Comptroller has the initial responsibility of determining whether the several conditions under which a National banking association may establish a branch are met. Community National

Bank of Pontiac v. Saxon, 310 F.2d 224 (6 Cir. 1962). Judicial review of his findings and conclusions is limited; a court determines only whether or not the action of the Comptroller was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2) (A); see, e. g., Warren Bank v. Camp, 396 F.2d 52, 56 (6 Cir. 1968); Citizens Bank of Hattiesburg v. Camp, 387 F.2d 375, 376 (5 Cir. 1967), cert. denied, 391 U.S. 904, 88 S. Ct. 1652, 20 L.Ed.2d 418 (1968); Warren Bank v. Saxon, 263 F.Supp. 34, 38–39 (E.D.Mich.1966).

It must also be emphasized that the plaintiffs do not present a claim of subterfuge, sham, fraud, or uncontrolled caprice. Case authorities such as Bank of Dearborn v. Saxon, 244 F.Supp. 394 (E. D.Mich.1965), aff'd, 377 F.2d 496 (6 Cir. 1967), are therefore inapposite in the context of the factual circumstances of the instant matter.

The plaintiffs' main argument takes the following form:

1. Under 12 U.S.C. §§ 36(b) (2), 36(c) and Conn.Gen.Stats. § 36–59, the Comptroller may issue a certificate for continuing a branch when banks merge, provided the branch is in operation at the time of the merger;

2. In the instant case Atlantic National and Connecticut National merged, de facto and/or de jure, prior to the date the Washington Avenue branch bank opened for business on March 30, 1970;

3. Therefore, the certificate for the branch was issued by the Comptroller contrary to law.

■ To determine the validity of the plaintiffs' position the Court necessarily must decide when the merger between Atlantic National and Connecticut National occurred. The plaintiffs contend there was a de facto merger of the banks "at least as of December 31, 1969", almost two months prior to the time the Comptroller approved the Washington Avenue branch on February 27, 1970. In support of their theory,

the plaintiffs rely on the principle of law that there is a de facto merger of corporations "where there is a bona fide attempt to consolidate under the statute or constitution, a colorable compliance therewith, and the exercise of assumption of powers as a consolidated corporation." 8 Fletcher Cyclopedia Corporations § 3768 (1966). They submit that the actions of the two banks' boards of directors and stockholders in agreeing to the merger and in applying for approval of the merger, coupled with an alleged "exercise of power as a merged corporation by Connecticut National," satisfy all the requisite factors to a de facto existence in law and equity.

However, while it is true that the banks did agree to merge and the Comptroller's approval was sought prior to December 31, 1969, the defendants' uncontroverted affidavits demonstrate that Connecticut National in no way had taken over the operations of Atlantic National on that date. Moreover, and more importantly, the relevant statute does not permit the result the plaintiffs seek. The Bank Merger Act of 1966, 12 U.S.C. § 1828(c) (2), (6) and (7), provides in pertinent part:

> (2) No insured bank shall merge or consolidate with any other insured bank or, either directly or indirectly, acquire the assets of, or assume liability to pay any deposits made in, any other insured bank except with prior written approval of the responsible agency, which shall be—
>
> (A) the Comptroller of the Currency if the acquiring, assuming, or resulting bank is to be a national bank or a District bank;
>
> \* \* \* \* \* \*
> (6) The responsible agency shall immediately notify the Attorney General of any approval by it pursuant to this subsection of a proposed merger transaction. . . . The transaction may not be consummated before the thirtieth calendar day after the date of approval by the agency.

> (7) (A) Any action brought under the antitrust laws arising out of a merger transaction . . . shall stay the effectiveness of the agency's approval unless the court shall otherwise specifically order.

Thus, since both Atlantic National and Connecticut National were national banks and the resulting bank is a national bank, the Act prohibits merger, de facto or otherwise, without the express approval of the Comptroller. As pointed out in the Comptroller's brief, "The defendant banks' boards of directors and stockholders could have approved the merger a dozen times, but without the Comptroller's approval [which approval was granted after December 31, 1969, on March 3, 1970], they could not have merged."

■■ Nor was there a de jure merger prior to March 30, 1970. Under the Act the Attorney General shall be notified immediately of the Comptroller's approval of a bank merger, and the Department of Justice has 30 days from the date of the approval to challenge under the antitrust laws the anticompetitive effects of the merger proposal. The Act specifically provides that the "proposed" merger transaction "may not be consummated before the thirtieth calendar day after the date of approval" by the Comptroller. Applying this clear language to the facts at bar, it is obvious that the merger between Atlantic National and Connecticut National could not have occurred in law prior to April 2, 1970, thirty days after the Comptroller's approval, during which time the Attorney General commenced no antitrust action. Cf. United States v. First City Nat. Bank, 386 U.S. 361, 370, 87 S. Ct. 1088, 18 L.Ed.2d 151 (1967). Since the Washington Avenue branch was in operation before April 2, the Comptroller was empowered to certify its continued existence under the merger.

■ Finally, the plaintiffs claim that the Comptroller, in approving the contested branch bank of Atlantic National

while the merger proposal was pending, ignored the realities of the situation and that public policy considerations should have required the Comptroller to disapprove the branch application. In effect, the plaintiffs contend the Comptroller abused his discretion and that his approval of the branch bank was arbitrary and capricious.

However, the record before the Court, which includes the entire administrative file, indicates the lack of merit in plaintiffs' contention. The Comptroller found it desirable to have a branch of Atlantic National in the business core of Stamford. The branch would be in the heart of an urban renewal project which when completed will cost $117 million and increase the residential population of the area from 30,000 to 60,000. Moreover, Atlantic National needed the branch because its present main office and branches were suburban in character and did not provide convenient services to the bank's customers in the business community. While the Comptroller was well aware of the pending merger proposal and accepted it as an important positive factor, he evaluated the merits of the branch application standing alone, and approved the application apart from the contemplated merger. The approval of the branch was not contingent on the approval of the merger; the two transactions were not interrelated, intertwined, interdependent, or a "package deal." There is not the slightest indication in the record that if the branch application were denied, the merger proposal would have been withdrawn; or, on the other hand, if the merger agreement were disapproved or met with Justice Department antitrust action, the branch application would have been withdrawn by Atlantic National. The two applications were handled by the Comptroller in good faith and with legal propriety, and his ultimate decisions have a rational basis in the record.

Accordingly, the plaintiffs' motion for summary judgment is denied; the defendants' motion for summary judgment is granted.