**Killington, Ltd. v. Jonathan Lash, as Secretary of the Vermont Agency of Natural Resources, et al.**

[572 A.2d 1368]

No. 89-185

Present: Allen, C.J., Peck, J., and Barney, C.J. (Ret.), Connarn, D.J. (Ret.) and Springer, D.J. (Ret.), Specially Assigned

Opinion Filed February 16, 1990

*Frank P. Urso*, Killington, and *Allan R. Keyes* and *Kimberly K. Hayden* of *Ryan Smith & Carbine, Ltd.*, Rutland, for Plaintiff-Appellee.

*Jeffrey L. Amestoy*, Attorney General, *Mark J. Di Stefano*, Assistant Attorney General, and *Jeanne Baker*, Legal Counsel to Governor, Montpelier, for Defendants-Appellants.

*John H. Fitzhugh* of *Sheehey Brue Gray & Furlong*, Burlington, for amicus curiae Mt. Mansfield Television, Inc.

**Allen, C.J.** The Secretary of the Agency of Natural Resources (the Agency), the Commissioner of the Department of Fish and Wildlife, and the Commissioner of the Department of Forests, Parks and Recreation all appeal a superior court order compelling the production of documents by the Agency. We reverse the judgment and remand the matter to the trial court.

In August, 1987, Killington Ltd. filed three written requests for public records pursuant to the Vermont Access to Public Records statute, 1 V.S.A. ch. 5, subchapter 3, with the Agency of Natural Resources and with the two departments, which are administrative units organized within the Agency. Each request sought essentially all records, papers, or materials of any kind relating to any state regulatory proceeding to which Killington was a party and three general subjects related to its interests: black bear and wildlife habitat, land planning and management relating to lands owned or used by Killington, and ski area and resort development policy that might affect Killington. In addition, all three requests contained the following paragraph:

(c) all correspondence, memoranda or other forms of communication relating to Killington Ltd. or its predecessor, Sherburne Corporation, between the Agency, any group or organization, any other agency, department, board, committee, commission or branch of state or federal government or any political subdivision thereof.

A large volume of requested materials was produced, but defendant Lash, Secretary of the Agency of Natural Resources, on behalf of the Agency and the two departments, advised Killington that he regarded two other classes of materials to be exempt. Lash's letter stated:

Specifically, various letters, memoranda, and other writings are exempt from inspection because they are covered by the attorney-client privilege, constitute protected trial preparation materials, are exempt under principles of executive privilege, or are relevant to litigation to which the Agency is presently a party of record.

. . . .

In addition, communications directly to or from the Governor's office will not be made available. They are protected from disclosure by executive privilege.

Plaintiff thereafter filed suit against defendants in Washington Superior Court seeking access to the materials withheld. Defendants moved for partial summary judgment with respect to certain weekly memoranda exchanged between Governor Kunin's office and defendants. Defendants relied in principal part on 1 V.S.A. § 317(b)(4), which excepts from public access all "records which, if made public pursuant to this subchapter, would cause the custodian to violate any statutory or common law privilege." Defendants contended that executive privilege was a common-law privilege in Vermont and fell within the excepting language of § 317(b)(4). In support of their theory defendants submitted affidavits stating that the memoranda in question were "prepared for the purpose of policy formulation and decision-making regarding Agency matters."

Plaintiff then filed its own motion for partial summary judgment ordering production of all Agency records which defendants withheld under the asserted privilege for an attorney's

work product, contending that the doctrine is not a valid ground for withholding documents under the Access to Public Records statute.[1]

The trial court concluded that there is no common-law or statutory executive privilege in Vermont, that each branch of government must interpret the law, but that the "Legislature delegated to the Judicial Branch the responsibility to make this determination," i.e., to decide whether the claim of executive privilege should stand. The court ordered an in camera review of the documents so that "the need for confidentiality can be weighed against the public's right to access to public records."[2] The trial court also granted plaintiff's motion, concluding that "'work product' exemptions from discovery under procedural rules do not rise to the status of common law or statutory privilege" and that documents withheld under that asserted exemption had to be furnished. The present appeal followed.

## I. Executive Privilege

### A. Threshold Issues

The question of whether Vermont common law recognizes the assertion of executive privilege[3] leads down many paths, includ-

---

[1] Defendants amended their answer to include an additional defense under 1 V.S.A. § 317(b)(3) covering "records which, if made public pursuant to this subchapter, would cause the custodian to violate duly adopted standards of ethics or conduct for any profession regulated by the state," arguing that disclosure would violate duly adopted ethical standards for attorneys, particularly Code of Professional Responsibility DR 4-101(B)(1). The trial court did not consider this additional defense, and because of today's decision on the work-product issue, we have no occasion to consider it here.

[2] The trial court apparently based its order for in camera inspection on 1 V.S.A. § 317(b)(12), "records concerning formulation of policy where such would constitute a clearly unwarranted invasion of personal privacy, if disclosed." That section is only obliquely referred to by defendants and is not the basis of the present appeal.

[3] The phrase "executive privilege" has not been used with precision or uniformity by courts. While applied to communications to or from the President, *United States v. Nixon*, 418 U.S. 683 (1974), or a governor, *Nero v. Hyland*, 76 N.J. 213, 386 A.2d 846 (1978), it is often applied "with respect to intragovernmental documénts reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Carl Zeiss Stiftung v. V. E. B. Carl*

ing historical, constitutional, and practical.[4] The heart of the question is the issue of separation of powers, which is a founding principle of both the Vermont and the federal systems of government.[5] A major threshold question is which branch of government may act as arbiter when executive privilege is asserted by one branch to bar the claim of another branch or the public to information. It has been argued that the sanctity of the executive branch would be violated by subjecting the question of executive privilege to another branch, including the judicial branch. As Justice Sutherland said in *Humphrey's Executor v. United States*, 295 U.S. 602, 629–30 (1935):

> The fundamental necessity of maintaining each of the three general departments of government entirely free from the control or coercive influence, direct or indirect, of either of the others, has often been stressed and is hardly open to serious question. . . . The sound application of a principle that makes one master in his own house precludes

---

*Zeiss, Jena,* 40 F.R.D. 318, 324 (D.D.C. 1966).

In this broader sense many of the policy issues concerned with a consideration of a claim of executive privilege become indistinguishable from other privileges or claims of exemption from right to know or freedom of information statutes, such as the attorney's work-product exception. See, e.g., *Zacher v. United States,* 227 F.2d 219, 226 (8th Cir. 1955), *cert. denied,* 350 U.S. 993 (1956) (the deliberative process privilege); *Taxation With Representation Fund v. Internal Revenue Service,* 646 F.2d 666, 677–81 (D.C. Cir. 1981) (the predecisional privilege).

In the present matter, "executive privilege" is used to describe only the State's claim with respect to communications to or from or reports intended for the governor. The exception based on the asserted attorney's work-product privilege is separately claimed and distinguished from the generality of "executive privilege" claims which use that phrase as an omnium gatherum for other theories of privilege.

[4] No Vermont case has yet addressed this issue. *Doe v. Salmon,* 135 Vt. 443, 378 A.2d 512 (1977), deals with the essentially unrelated question of the governor's discretionary power to declare certain public records immune from disclosure on various grounds other than executive privilege, against a citizen's common-law right to obtain public records.

[5] The federal constitution contains no explicit provision regarding separation of powers. Chapter II, § 5 of the Vermont Constitution provides:

> The Legislative, Executive, and Judiciary departments, shall be separate and distinct, so that neither exercise the powers properly belonging to the others.

him from imposing his control in the house of another who is master there.

See also *Nixon v. Sirica*, 487 F.2d 700, 769 (D.C. Cir. 1973) (Wilkey, J., dissenting).

While recognizing this principle, neither our Vermont nor the federal governmental systems has allowed each branch to reside in its own castle, with inherently absolute prerogatives and defenses against the will of the other branches. "Interaction, not independence, has historically been characteristic of the operation of the three branches of our government." Cox, *Executive Privilege*, 122 U. Pa. L. Rev. 1383, 1388 (1974). The role of the judicial branch in breaking the deadlock among branches where privilege is asserted by one against the other was set in *United States v. Burr*, 25 F. Cas. 30 (C.C.D. Va. 1807) (No. 14,692d), in which Chief Justice Marshall, while sitting on the circuit court, ruled that a subpoena may be directed to the President. See also *Westinghouse Electric Corp. v. City of Burlington*, 351 F.2d 762, 767–68 (D.C. Cir. 1965); and cf. *Monti v. State*, 151 Vt. 609, 611–14, 563 A.2d 629, 630–32 (1989) (propriety of oral deposition of high government officials).

If the judicial branch may exercise the power to determine when legal process lies against a chief executive, then separation of powers principles cannot logically be asserted to justify an absolute privilege by a president or governor to withhold information that would otherwise be subject to legal process. See Note, *Discovery of Government Documents and the Official Information Privilege*, 76 Colum. L. Rev. 142, 165–68 (1976). Additionally, the nearly universal conclusion of state and federal courts is that judges are the final arbiters of disputes among the branches where one asserts a privilege against one or both of the other branches. See, e.g., *United States v. Nixon*, 418 U.S. 683, 703–05 (1974); *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953); *Nixon v. Sirica*, 487 F.2d at 713 (applicability of executive privilege is ultimately for courts, not the executive, to decide); *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 788, 794 (D.C. Cir. 1971) ("no executive official . . . can be given absolute authority to determine what documents in his

possession may be considered by the court"); *Hamilton v. Verdow*, 287 Md. 544, 562, 414 A.2d 914, 924 (1980).

By strong precedent and necessity, we must act as the final arbiter among the branches of government on the issue of executive privilege. In accepting this task, we set as our goal criteria that are neutral and processes that assure the greatest respect for the needs and interests of each branch.

## B. Recognition of the Privilege

Federal and state courts have been emphatic and nearly unanimous in supporting the existence of some species of executive privilege for presidents and governors who seek to maintain the privacy of documents relating to the formulation of policy. Even in holding that the President was amenable to service of process, Chief Justice Marshall acknowledged the weight of presidential office and the necessary exercise of a reasonable privilege in the pursuit of that office:

> That the president of the United States may be subpoenaed, and examined as a witness, and required to produce any paper in his possession, is not controverted. I cannot, however, on this point, go the whole length for which counsel have contended. The president, although subject to the general rules which apply to others, may have sufficient motives for declining to produce a particular paper, and those motives may be such as to restrain the court from enforcing its production. I do not think precisely with the gentlemen on either side. I can readily conceive that the president might receive a letter which it would be improper to exhibit in public, because of the manifest inconvenience of its exposure. The occasion for demanding it ought, in such a case, to be very strong, and to be fully shown to the court before its production could be insisted on. I admit, that in such a case, much reliance must be placed on the declaration of the president; and I do think that a privilege does exist to withhold private letters of a certain description.

*United States v. Burr*, 25 F. Cas. at 191–92.

Federal and state courts have accorded to the chief executive of the nation or of a state a privilege which is "fundamental to the operation of Government and inextricably rooted in the separation of powers." *United States v. Nixon*, 418 U.S. at 708. "[T]his executive privilege protects and insulates the sensitive decisional and consultative responsibilities of the Governor which can only be discharged freely and effectively under a mantle of privacy and security." *Nero v. Hyland*, 76 N.J. 213, 225–26, 386 A.2d 846, 853 (1978). Apart from the origins of the privilege in the principle of separation of powers, some courts have stressed the role of the privilege as part of the common law of evidence. See, e.g., *Ethyl Corp. v. Environmental Protection Agency*, 478 F.2d 47, 51 (4th Cir. 1973); *Hamilton*, 287 Md. at 562, 414 A.2d at 924; Carrow, *Governmental Nondisclosure in Judicial Proceedings*, 107 U. Pa. L. Rev. 166, 169 (1958). But see *Babets v. Secretary of the Executive Office of Human Services*, 403 Mass. 230, 233, 526 N.E.2d 1261, 1263 (1988). The court in *Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324–25 (D.D.C. 1966), clearly expressed the balancing function implied by the privilege:

> This privilege, as do all evidentiary privileges, effects an adjustment between important but competing interests. There is, on the one hand, the public concern in revelations facilitating the just resolution of legal disputes, and, on the other, occasional but compelling public needs for confidentiality. In striking the balance in favor of nondisclosure of intra-governmental advisory and deliberative communications, the privilege subserves a preponderating policy of frank expression and discussion among those upon whom rests the responsibility for making the determinations that enable government to operate, and thus achieves an objective akin to those attained by other privileges more ancient and commonplace in character.

Both the constitutional and common-law roots of the privilege strongly require its recognition in Vermont. Our government, no less than that of any other state, or the federal government, is poised between the same countervailing interests. As objectionable as the image is of government conducted

in secrecy's darkened chambers, it is hard to imagine a government functioning with no opportunity for private exchange among its ministers, with no moments of speculation, venturesome alternatives, or retractable words. And no less than the national government does Vermont government need to preserve "the confidentiality of intragovernmental documents reflecting advisory opinions, recommendations and deliberations comprising parts of the process by which governmental decisions and policies are formulated." Cox, 122 U. Pa. L. Rev. at 1410.

██ The major issues in both federal and state litigation concerning executive privilege have not concerned the existence of the privilege, but rather its incidents and characteristics. With few exceptions[6] courts have concluded that the privilege is not an absolute one. See, e.g., *United States v. Nixon*, 418 U.S. at 707; *Doe v. Alaska Superior Court*, 721 P.2d 617, 623 (Alaska 1986); *State ex rel. Attorney General v. First Judicial District Court of New Mexico*, 96 N.M. 254, 258, 629 P.2d 330, 334 (1981). Unlike most evidentiary privileges, it is for the benefit of the public, not the executive who asserts it. *Kaiser Aluminum & Chemical Corp. v. United States*, 157 F. Supp. 939, 947 (Ct. Cl. 1958). It is not protection of government officials, but rather protection of the effectiveness of the overall governmental system that is at stake. As the court said in *Carl Zeiss Stiftung*, 40 F.R.D. at 324–25, the privilege serves the purpose of promoting "frank expression and discussion among those upon whom rests the responsibility for making the determinations that enable government to operate, and thus achieves an objective akin to those attained by other privileges more ancient and commonplace in character." We agree that the privilege is qualified and not absolute.

## C. Balancing the Interests

██ Whether or not a claim of executive privilege will be honored is a question always contingent on a balancing of the

---

[6] See *In re Hartranft*, 85 Pa. 433 (1877).

interests of confidentiality against those of disclosure. As the court said in *Hamilton v. Verdow*:

> [W]hen a formal claim of executive privilege is made for confidential communications of the chief executive, or confidential communications of other government officials of an advisory or deliberative nature, there is a presumptive privilege, with the burden upon those seeking to compel disclosure.

287 Md. at 563, 414 A.2d at 925; see also *United States v. Nixon*, 418 U.S. at 708.

Most litigation involving claims of executive privilege involves demands for information from government for use as evidence in a civil or criminal trial. See, e.g., *United States v. Nixon*, 418 U.S. at 711–13; see also Cox, 122 U. Pa. L. Rev. at 1408. The strong interest in a fair trial and the due administration of justice give relatively great weight to the need for disclosure in the application of the balancing process. Similarly, where litigation concerns alleged governmental wrongdoing and the information sought is essential evidence, the very nature of the conflict between the interests of confidentiality and disclosure, while not determinative, will necessarily give some weight to the need for disclosure. See *Rosee v. Board of Trade of City of Chicago*, 36 F.R.D. 684, 689–90 (N.D. Ill. 1965); *Bank of Dearborn v. Saxon*, 244 F. Supp. 394, 402–03 (E.D. Mich. 1965), *aff'd*, 377 F.2d 496 (6th Cir. 1967).

Plaintiff contends that the Access to Public Records statute places the burden of establishing any exemption to disclosure on the state Agency, relying on 1 V.S.A. § 319(a), which provides that any person aggrieved by a denial of a request for public records shall apply to the superior court and that court:

> [S]hall determine the matter de novo, and may examine the contents of such agency records in camera to determine whether such records or any part thereof shall be withheld under any of the exemptions set forth in section 317 of this title, and the burden is on the agency to sustain its action.

The language of § 319(a) at first blush appears at odds with the procedure followed by a majority of courts in applying the

common-law privilege, under which the requester assumes the burden of demonstrating need once a prima facie case has been made for the existence of a privilege. It is not. The language of § 317(b)(4) brings common-law privileges with their established burdens into the law. Once incorporated, the privileges are to be applied as a whole and not piecemeal. The manner in which the common-law executive privilege is to be applied is an integral part of the law incorporated through § 317(b). Cf. *Denver Post Corp. v. University of Colorado*, 739 P.2d 874, 880–81 (Colo. Ct. App. 1987). The function and meaning of the privilege would be markedly altered if necessity for the information were to be presumed and the burden of overcoming the presumption of necessity were to be placed on the claimant of the privilege. The requirement that a person seeking disclosure first demonstrate need before obtaining the right to in camera inspection by the court is an essential part of the privilege itself, not a corollary procedure annexed to the privilege. While the purpose of this law was to establish the right of citizens to information in the hands of their government without a particular showing of need, 1 V.S.A. § 315, the Legislature evinced no intent in the passage of this landmark legislation to alter the balance among the branches of government. The position of the plaintiff and the amicus would effect a major change in that balance by placing the burden on a governmental agency asserting common-law executive privilege to prove the necessity for that privilege.

In sum, we hold that when a claim of executive privilege is asserted, the requester has the burden of providing reasons why the need for the information outweighs the interest in confidentiality. *Hamilton v. Verdow*, 287 Md. at 563, 414 A.2d at 925; *Doe v. Alaska Superior Court*, 721 P.2d at 626.

In the present case the trial court concluded that since Vermont did not recognize executive privilege, no showing of necessity was required, and hence it ordered in camera inspection without a basis to do so. In camera inspection by the court may not amount to full disclosure, but in a given case, it can irrevocably sacrifice the interest sought to be protected by exercise of executive privilege, even if the court decides that the interest in confidentiality outweighs the need for disclosure.

See *Hamilton v. Verdow*, 287 Md. at 566, 414 A.2d at 926. In light of our decision today, the trial court order for in camera inspection cannot stand. Since the need for a showing of necessity was not clear either under our case law prior to the decision announced today or the ruling of the trial court, the case must be remanded to give plaintiff an opportunity to make such a showing.[7]

Defendants argue that plaintiff's failure to make a showing of need when confronted with the motion for summary judgment precludes further consideration of the issue in this proceeding. Inasmuch as plaintiff could attempt such a showing in connection with a later identical document request, a remand for this purpose is warranted.

■ Since the case on remand will necessarily be one of first impression, some additional guidance is offered. In the context of a request under the Access to Public Records statute, and in the absence of a demonstration that the information sought is necessary as evidence in a criminal or civil trial, a prima facie claim of executive privilege enjoys a rebuttable presumption over an asserted interest in disclosure based solely on the statute.

■ ■ If a requester responds to a prima facie showing of executive privilege with a showing of need for the information, the trial court may order an in camera inspection of the documents sought. Where those documents directly involve the governor, even an in camera inspection might materially and irrevocably compromise the fundamental interests of the executive branch of government. Similarly, an agency might also possess documents that an in camera inspection would compromise. The agency, however, must support its position by affidavit. In such cases, the governor or the agency shall be afforded the opportunity to seek effective review in this Court after the inspection order issues, but before it is effected.

---

[7] Plaintiff also argues that various acts of some defendants may have constituted waiver of the privilege. That issue was not considered by the trial court and is not before us on the present record. However, plaintiff may reassert waiver arguments on remand.

Where in camera inspection itself would not compromise the executive's fundamental interests, and the court has conducted an in camera inspection and ordered the release of requested documents, a state agency may still move for review before release is effected. In keeping with the letter of the statute, 1 V.S.A. § 319(b), such motions for review, if granted, should be heard and decided on an expedited basis.

Our holding today accommodates the competing interests of government and private requesters and employs procedures allowing appropriate review at sensitive junctures in the process. While this procedure allows the executive branch to self-certify a basis for executive privilege, in camera inspection by the trial court and review here provide sufficient protection. Additionally, the insubstantial exercise of the privilege inevitably bears costs in credibility and public accountability, upon which each branch of government fundamentally relies. We recognize that this procedure requires the Court to judge the interests of the other branches; however, to abjure that role would be to leave the problem of executive privilege permanently unsolved and would not foster the interests of separation of powers or of interbranch comity.

## II. Work-Product Doctrine

The trial court concluded that "[t]he documents claimed exempt by the Agency under the rubric of 'work product privilege' should be produced by the Agency. 'Work product' exemptions from discovery under procedural rules do not rise to the status of common law or statutory privilege." Defendants argue that the materials sought by plaintiff fall within an attorney's work-product privilege and that such privilege, like executive privilege, is imported into the Access to Public Records statute under 1 V.S.A. § 317(b)(4). Plaintiff responds that there is no work-product "privilege" as such in Vermont, since the principle was only formalized in Vermont when the Vermont Rules of Civil Procedure were adopted in 1971, specifically

V.R.C.P. 26(b)(3).[8] Because § 317(b)(4) references only common-law privileges, plaintiff stresses the fact that at the time § 317(b)(4) was adopted there were no litigated cases in Vermont on the question, and hence no established, court-declared privilege to be incorporated into the statute via § 317(b)(4).

The adoption, however, of a formal work-product principle in V.R.C.P. 26(b)(3) does not support the inference that our practice allowed the discovery of attorney work-product materials prior to that time. Plaintiff cannot contend that a litigant had a right to obtain discovery of an attorney's work product prior to the time the statute was adopted merely because this Court had not then declared a common-law privilege in Vermont. Plaintiff's argument tacitly assumes that the "common law" referred to in § 317(b)(4) is the law as it existed on the date of the adoption of the statute.[9] But the Access to Public Records statute was not intended to stultify the development or recognition of common-law privileges as of the date of its adoption. Such a result would establish important policies under the statute according to the happenstance of what was and what was not litigated and decided in Vermont as of 1976. The Legislature intended no such result and we cannot accept it. The common

---

[8] V.R.C.P. 26(b)(3) states in relevant part:

> (3) *Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the judge shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

[9] The Right to Know Statute was adopted in 1976. 1975, No. 231 (Adj. Sess.). The amicus brief filed on behalf of Mt. Mansfield Television, Inc. concedes that the common law is not fixed as of any moment in time and that "it is appropriate to consider how other jurisdictions in our Union have interpreted the common law vis-a-vis executive privilege to determine whether it should be a privilege brought within § 317(b)(4)."

law is an active, not a static, flow of ideas and principles, a living stream, constrained by policy and precedent within this branch, and by the supervening guides of constitution and statute. See *Hay v. Medical Center Hospital of Vermont*, 145 Vt. 533, 542–44, 496 A.2d 939, 944–46 (1985).

The strong public interest in the workings of government was the motivating force behind adoption of the statute.[10] The law necessarily confers to the courts those delicate questions at the interstices between the interests of disclosure and the need for confidentiality. See generally *Doe v. Salmon*, 135 Vt. 443, 378 A.2d 512 (1977); *McClain v. College Hospital*, 99 N.J. 346, 492 A.2d 991 (1985).

The case for the existence of a general and pervasive common-law work-product privilege prior to the adoption of both the Vermont Rules of Civil Procedure and the Access to Public Records statute is substantial. In *Hickman v. Taylor*, 329 U.S. 495 (1947), the United States Supreme Court rejected a party's claim under federal law that he was entitled to discover materials from defendants' attorney's files, including mental impressions. The Court there stated:

> When [Federal] Rule 26 and the other discovery rules were adopted, this Court and the members of the bar in general certainly did not believe or contemplate that all the files and mental processes of lawyers were thereby opened to the free scrutiny of their adversaries.

---

[10] 1 V.S.A. § 315 states:

> It is the policy of this subchapter [5] to provide for free and open examination of records consistent with Chapter I, Article 6 of the Vermont Constitution. Officers of government are trustees and servants of the people and it is in the public interest to enable any person to review and criticize their decisions even though such examination may cause inconvenience or embarrassment. All people, however, have a right to privacy in their personal and economic pursuits, which ought to be protected unless specific information is needed to review the action of a governmental officer. Consistent with these principles, the general assembly hereby declares that certain public records shall be made available to any person as hereinafter provided. To that end, the provisions of this subchapter shall be liberally construed with the view towards carrying out the above declaration of public policy.

329 U.S. at 514. Fed. R. Civ. P. 26, which is the model for V.R.C.P. 26, was adopted to reflect the holding in *Hickman*. The Reporter's Notes to V.R.C.P. 26 contain the following statement:

> Rule 26(b)(3), permitting discovery of trial preparation materials upon a proper showing, is new to Vermont, although presumably the Vermont courts, in applying the former discovery statutes, would have followed Hickman v. Taylor, 329 U.S. 495 (1947), upon which the rule is in part based. . . . In the spirit of Hickman, the rule protects absolutely against disclosure of documents or parts of documents or other things containing "mental impressions, conclusions, opinions, or legal theories of an attorney, or other representative." This protection applies only to production of documents or things; under Rules 33 and 36, interrogatories and requests for admissions as to the application of law to fact may require some disclosure of mental impressions, conclusions, or opinions. . . . Any more general effort to obtain discovery of such matters, however, as by direct question on oral deposition, would be subject to the protection of the Hickman doctrine as a matter of inherent power.

The Reporter's Notes suggest that the principles underlying *Hickman* would have been applied by this Court even prior to the adoption of the present Rule 26, and we agree. There are no Vermont cases on the point, but that dearth undoubtedly results from the accepted conventions of the discovery practice prior to the adoption of Rule 26, rather than from the obverse assumption that parties were free to obtain discovery of materials that are now subject to the strictures of the rule. Though neither the federal Freedom of Information Act (FOIA) nor state access to document statutes are identical to Vermont's Access to Public Records law, a preponderance of federal and state holdings support a work-product privilege.

Federal case law clearly makes the attorney's work-product rule in *Hickman* applicable to government attorneys in litigation. The United States Supreme Court has interpreted this section as "incorporat[ing] the privileges which the Govern-

ment enjoys under the relevant statutory and case law in the pretrial discovery context." *Renegotiation Board v. Grumman Aircraft Engineering Corp.*, 421 U.S. 168, 184 (1975); see also *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154 (1975).

In some states specific statutory language bars production of documents that "would not be available by law or rule of court to an opposing party in litigation." R.I. Gen. Laws § 38-2-2(d)(5) (Supp. 1989); see, e.g., *Hydron Laboratories, Inc. v. Department of Attorney General*, 492 A.2d 135 (R.I. 1985). The federal Freedom of Information Act contains a similar principle,[11] and federal courts have long construed the statute to withhold from a member of the public documents which a private party could not discover in litigation with the agency. *EPA v. Mink*, 410 U.S. 73, 85–86 (1973); *NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 148; *Conoco Inc. v. United States Department of Justice*, 687 F.2d 724, 727 (3d Cir. 1982). State precedents also support a work-product privilege, either under specific statutory language, see, e.g., Fla. Stat. Ann. § 119.07(3)(o), or the common law, see, e.g., *Denver Post Corp. v. University of Colorado*, 739 P.2d at 880.

Very few jurisdictions have considered this question and arrived at a contrary conclusion.[12] Following successive holdings by the Florida Supreme Court that public entities lacked protection either under the attorney-client privilege or the work-product doctrine,[13] the Florida Legislature granted a statutory exemption covering, inter alia, an attorney's work product.[14]

---

[11] Exemption 5 of the federal Freedom of Information Act (FOIA) bars access of right to "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5) (1982).

[12] *Scott v. Smith*, 292 Ark. 174, 176, 728 S.W.2d 515, 516 (1987) (attorney-client privilege is not basis for exception).

[13] See, e.g., *Neu v. Miami Herald Publishing Co.*, 462 So. 2d 821 (Fla. 1985); *Orange County v. Florida Land Co.*, 450 So. 2d 341 (Fla. Dist. Ct. App.), *review denied*, 458 So. 2d 273 (Fla. 1984).

[14] The exemption in Fla. Stat. § 119.07(3)(o) (Supp. 1989), states:

A public record which was prepared by an agency attorney (including an attorney employed or retained by the agency or employed or retained by another public officer or agency to protect or represent the interests of

Prior to the legislative change, the Florida courts considered themselves bound by their legislation, albeit noting "the imbalanced posture and the disadvantaged status of public entities involved in litigation under the Public Records Act as so construed." *City of Orlando v. Desjardins*, 493 So. 2d 1027, 1029 (Fla. 1986).

We note the same imbalance in the position argued by plaintiff, but § 317(b)(4) allows this Court to fill the void. We conclude that an attorney's work product has never been subject to routine discovery as a principle of common law and now hold that it is protected by a common-law attorney's work-product privilege, the dimensions of which we equate to the scope and application of the work-product exemption in V.R.C.P. 26(b)(3).

A contrary rule would produce an anomalous and unfair result. Plaintiff's position would effectively nullify V.R.C.P. 26(b)(3) as it applies to government attorneys, and would create an unwarranted advantage for parties in litigation with the government, since whatever lay outside the scope of discovery under Rule 26 would be accessible through the Access to Public Records statute. Such an outcome would run against our duty to promulgate and apply rules for the governance of our courts and to regulate and supervise the practice of law.

Our ruling is not confined to court litigation. There is little basis to distinguish contested administrative proceedings from court proceedings. The Legislature has long assigned adjudicative functions to state boards, and as our society grows more complex and specialized, the role of government agencies with formal party status in such trial-like adjudicative proceedings is bound to expand. It would elevate form over function if we established a work-product rule governing agency appear-

the agency having custody of the record) or prepared at the attorney's express direction, which reflects a mental impression, conclusion, litigation strategy, or legal theory of the attorney or the agency, and which was prepared exclusively for civil or criminal litigation or for adversarial administrative proceedings, or which was prepared in anticipation of imminent civil or criminal litigation or imminent adversarial administrative proceedings, is exempt from the provisions of [the Public Records Act] until the conclusion of the litigation or adversarial administrative proceedings.

ances in our courts and another rule governing what are essentially full-blown adversarial proceedings before administrative bodies. We hold that where an agency appears as a party in a contested administrative proceeding, the attorney's work-product doctrine should be applied as if the action were in a court.

As the trial court did not consider any of the documents withheld upon the State's work-product claim, this matter must be remanded for a consideration of the status of each document for which such a claim is asserted.

We must emphasize that the work-product exemption is a narrow one, both under *Hickman* principles and the civil rules. The litigation which serves as the basis for the claim must be in esse and not merely threatened. *Grolier Inc. v. Federal Trade Commission*, 671 F.2d 553, 556 (D.C. Cir. 1982), *rev'd on other grounds*, 462 U.S. 19 (1983). Moreover the exemption applies only to "those documents, and only those documents, normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. at 149. Rule 26 clearly contemplates that materials not "prepared in anticipation of litigation or for trial" and which are otherwise subject to discovery are discoverable without a showing of substantial need, even though in the hands of an attorney. See V.R.C.P. 34.[15] The materials supporting the assertion of a privilege must pertain to the lawsuit. See *City of New Haven v. Freedom of Information Commission*, 205 Conn. 767, 774–75, 535 A.2d 1297, 1301 (1988). The rule also contemplates that "mental impressions, conclusions, opinions, or legal theories of an attorney" are absolutely protected from discovery irrespective of any assertion of need, so long as these are part of the trial preparation product. Additional distinctions may well be presented for determination, such as claims of privilege that may be outweighed by a

---

[15] The letter of Secretary Lash, *supra*, recites that some materials are "relevant to litigation to which the Agency is presently a party of record." While we do not take this occasion to consider specific claims of privilege, all of which must be separately examined on remand, we note that such a claim, standing alone, would not invoke the attorney's work-product privilege, since much that is "relevant to litigation" is not necessarily "work product," such as data and other factual information collected for trial.

showing of need [16] and distinctions between "facts" on the one hand and "mental impressions" or "deliberations" on the other. See *Martin v. Office of Special Counsel*, 819 F.2d 1181, 1185–86 (D.C. Cir. 1987).

We appreciate that the process of identifying which documents fall within the privilege may be complex, since each document will stand on its own, and the few subtleties we have noted in passing do not come close to exhausting the list. We again acknowledge that both litigants and courts may have an especially difficult task in applying the privilege in the environment of the Access to Public Records law (distinguished from a discovery request in litigation) as to those documents or materials for which special need must be shown in order to overcome a prima facie claim of executive privilege. The outcome of such questions in this Court must await another day; however, our holding today should set a course toward resolving both the present controversy and those that surely lie ahead as citizens hold their government officials to increased scrutiny and make broader use of the Access to Public Records law in service of that goal.

*The judgment of the trial court is reversed, and the matter remanded for further proceedings consistent with this opinion.*

---

[16] In *Hickman v. Taylor*, 329 U.S. 495 (1947), for example, the Court held that witness statements prepared at the request of an attorney are privileged work product and are not subject to discovery unless the discovering party can show that the materials are essential. *Id.* at 511. On the other hand, notes taken by an attorney during witness interviews are always privileged, as a practical matter. *Id.* at 512–13.