Filed 07/16/21

VERMONT SUPERIOR COURT
Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 173-4-20 Wncv

| Energy Policy Advocates vs. Attorney General's Off |
|---|

# DECISION ON MOTION

*Energy Policy Advocates v. Attorney General's Office,* No. 173-4-20 Wncv

      Among the more prominent roles of the Vermont Attorney General is providing legal representation for "the State in the preparation and trial of all . . . civil . . . causes in which the State is a party or is interested when, *in his or her judgment*, the interests of the State so require." 3 V.S.A. § 157 (emphasis added). Nothing in Vermont law expressly limits the twin veils of secrecy behind which lawyers routinely operate—work product immunity and attorney–client privilege—in the circumstance of the Attorney General's Office (AGO) despite the AGO's dual role as both attorney and client with the unique discretion to unilaterally determine what may be in the State's interests. The Public Records Act (PRA), 1 V.S.A. §§ 315–320, one of two principal methods by which transparency in government is preserved in Vermont, applies fully, at least conceptually, to the AGO.[1] *Id*. § 317(a)(2). However, records subject to work product immunity or the attorney–client privilege are categorically exempt from the Act. *Id*. § 317(c)(4). Though the AGO is no ordinary lawyer, Exemption 4, on its face, applies broadly and is not customized to or limited in the special case of the AGO. Because so much of the AGO's work is subject to work product immunity and attorney–client privilege, Exemption 4 thus has the apparent effect of largely shielding the AGO from the transparency and public scrutiny that the Act ensures with regard to all other public agencies.

      This case sits directly at the intersection of the AGO's desire for confidentiality in its lawyer and litigant capacities and the public's desire for transparency as to those undertakings. With several public records requests, Requestor Energy Policy Advocates has asked the AGO to produce numerous records pointedly related to the AGO's civil litigation activity, specifically regarding certain environmental litigation, or interests in litigation, controversies not specific to Vermont (principally relating to climate change).[2] Remaining in dispute are 7 environmental *common interest agreements* (CIAs) to which the AGO is a party and an enormous volume (at least 2,700 pages) of documents responsive to Requestor's broad requests for copies of e-mails, mostly between Vermont Assistant Attorney General Nick Persampieri and specific others, that generally fall

---

[1] The other, of course, being Vermont's Open Meeting Law, 1 V.S.A. §§ 310–314.

[2] Requestor's requests have generated four cases, docketed as Nos. 173-4-20 Wncv, 207-6-20 Wncv, 21-CV-452, and 21-CV-896. All four cases have been consolidated and are proceeding under No. 173-4-20 Wncv.

within the scope of the CIAs.  Requestor is dissatisfied with the AGO's refusal to produce the withheld documents under claims of work product immunity and attorney–client privilege and sought review here after unsuccessfully seeking administrative review.[3]

Procedurally, the State has filed a summary judgment motion.  There is no material dispute of fact, and the CIAs are in the record for in camera review.  The question is how the PRA applies to the CIAs and the subsequent communications within their scope, matters that the parties have briefed extensively.  Though the court generally does not take evidence in the course of summary judgment proceedings, due to the novelty of the issues and the statutory mandate to resolve PRA cases expeditiously, it did so in this case on June 14, 2021, merely to better understand factual setting and the parties' positions—not to resolve any disputed facts.

*The disputed records*

In its several requests, Requestor sought copies of any *common interest agreements* entered into by the AGO in 2019 or 2020 mentioning carbon dioxide, greenhouse gas emissions, or National Ambient Air Quality Standards.  The common interest rule, to the extent observed, generally expands attorney–client privilege to encompass third parties with whom the client shares a sufficient litigation interest, even though the parties are not represented by the same lawyer.  It permits collaboration under the veil of privilege in pursuit of ongoing or anticipated litigation.  See generally Restatement (Third) of the Law Governing Lawyers § 76; see also 1 Attorney-Client Privilege in the U.S. §§ 4:35–4:38; 1 McCormick On Evid. § 91.1 (8th ed.).  A common interest *agreement*, though not necessary to proper invocation of the rule, refers to a formalized relationship between collaborating parties and, among other things, may detail their expectations regarding confidentiality, strategy, mental impressions, and other issues.  The AGO has withheld 7 common interest agreements entered into between it and, mostly, other state AGs responsive to Requestor's request as well as many communications undertaken within their scope.

The AGO has submitted indexes describing in detail the withheld CIAs and the many documents responsive to Requestor's other requests, all of which the AGO represents were communications undertaken within the scope of and for litigation purposes outlined in relevant CIAs.

In supplement to the already filed affidavit, at the June 14 hearing, the court received a description of and update on the various CIAs as follows.

Auto Greenhouse Gas: This CIA relates to issues of California's right to independently establish auto emission standards.  Vermont uses California emissions standards as its own.  In the last administration, rulemaking had commenced to change California's right to independently set standards.  Automakers as well

---

[3] In some cases, the State also has claimed the litigation exemption, 1 V.S.A. § 317(c)(14), which the court recognizes also is intended to preserve the State's ability to litigate effectively.  However, the parties have not focused on that exemption in the briefing of this case and the court declines to address it now.

Order
173-4-20 Wncv Energy Policy Advocates vs. Attorney General's Off

Page **2** of **13**

as some state governments had an interest in resolving the question of what standards should be used.  The CIA includes those states and some automakers sharing a common interest.  Litigation started in the D.C. District Court, and Vermont is a party.  The litigation is stayed pending review by the new administration.  The CIA's inclusion of some automakers has allowed a negotiated framework for emission standards to be accomplished, although it is not clear that those have been implemented or how they may affect the California standard.

California Cap and Trade: Vermont signed with other states out of concern over the outcome of a case called U.S. v. California, in which California prevailed but the Trump administration appealed.  Vermont believed the issue in the case had potential implications for it to enter into agreements with foreign governments, particularly Quebec concerning Lake Champlain pollution issues.  Vermont filed an amicus brief.  The new administration made changes in policy, which terminated the litigation.

Climate Change Public Nuisance Litigation: Vermont joined the CIA with other states and appeared in multiple suits as amicus.  The issues concerned efforts by municipalities and states to use state courts to address damage claims against others for climate change impacts.  The issue involved and of importance to Vermont was the availability of state court forums for such suits and removal of the same to federal court.  The matter has concluded.

Greenhouse Gas Litigation: This CIA was executed among other states in anticipation of judicial or administrative action to force the federal government to take action concerning greenhouse gas emissions.  No litigation was taken by any state under this CIA, although it appears the group engaged in some efforts to lobby the Trump administration's EPA.  The group was unable to reach agreement on how to move forward to accomplish their goals.  The new administration is taking a fresh look at the issue and that may resolve the matter, or another entity may commence action.  This is the only CIA at issue where no litigation in fact commenced.

NEPA Litigation: Vermont joined a case brought in California where the National Environmental Policy Act, which requires an environmental review before federal agencies undertake projects, had been diminished under the Trump Council of Environmental Quality.   Vermont perceived that might affect federal action in Vermont such as in national forests, highways, and military bases.  This action is now stayed with the change of administration.

Oil and Gas CIA: Vermont was a signatory with other states, and has joined as a party plaintiff in September 2020, in litigation challenging Bureau of Land Management development of the Arctic National Wildlife Reserve.  The case is being revisited by the new administration and is on hold.  The primary issue of concern is habitat destruction in the Arctic.  The State's interest is less direct than in other cases and appears to be based on a reflection of what the AG believes public interest in Vermont supports.

Petroleum Development CIA: Vermont has joined this CIA with other state AGs and has joined as a signatory on a comment letter opposing federal allowance of exploration of the arctic petroleum reserve. Non-governmental organizations have brought suit, and Vermont is contemplating submission of amicus briefing.  The interest of Vermont is asserted to be impacts on natural resources, environment, and the economy, and whether federal action may require the expenditure of state resources related to those impacts.

*Work product doctrine*

The AGO argues that all withheld documents are exempt from production under 1 V.S.A. § 317(c)(4) (exempting documents subject to most statutory or common law privileges).  See *Killington, Ltd. v. Lash*, 153 Vt. 628, 646 (1990) (recognizing that work product falls within the scope of Exemption 4).

Work product immunity extends well beyond attorney–client privilege to protect the confidentiality of the lawyer's files and thoughts and so protects the adversarial method itself.  In general terms, "[w]ork product consists of tangible material or its intangible equivalent in unwritten or oral form, other than underlying facts, prepared by a lawyer for litigation then in progress or in reasonable anticipation of future litigation."  Restatement (Third) of the Law Governing Lawyers § 87(1).  Opinion work product refers to work product revealing the lawyer's "opinions or mental impressions."  *Id*. § 87(2).  Any other kind is "ordinary work product."  *Id*.  Opinion work product is absolutely "immune from discovery or other compelled disclosure unless . . . the immunity is waived."  *Id*. § 89.  Ordinary work product is immune unless the "inquiring party" can establish "a substantial need for the material in order to prepare for trial" and cannot reasonably get the material elsewhere. *Id*. § 88.

Unlike attorney–client privilege, which is ordinarily waived upon disclosure to a third person, work product immunity continues regardless of such a disclosure except "in circumstances in which there is a significant likelihood that an adversary or potential adversary in anticipated litigation will obtain it." Restatement (Third) of the Law Governing Lawyers § 91(4).

Work product immunity will also be waived where there is a sufficient disclaimer of its protection or an insufficient objection to another party's attempt to secure it "in a proceeding before a tribunal."  *Id*. § 91(2), (3).

The U.S. Supreme Court has described the motivation for recognition of work product immunity as follows:

Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients.  In performing his various duties, however, it is essential that a lawyer work with a certain degree

of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case as the 'Work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947) (citation omitted).

The U.S. Supreme Court has long held that, regarding a federal public records request involving work product immunity under FOIA Exemption 5, *either* absolute or qualified immunity prevents disclosure. *F.T.C. v. Grolier Inc.*, 462 U.S. 19, 27–28 (1983).

The FOIA and the PRA differ in many regards. However, the court concludes that work product immunity under PRA Exemption 4 also prevents disclosure regardless whether the immunity is absolute or qualified. The showing necessary to overcome qualified immunity requires proof of a substantial need for the material *to prepare for trial*. Any such showing would have to be made under the discovery rules in the lawsuit for which the material is needed. V.R.C.P. 26(b)(4). That will never be a PRA case.[4] "Motive is irrelevant" to public records requests. *Finberg v. Murnane*, 159 Vt. 431, 437 (1992). A PRA requestor's "need" for the requested material is utterly irrelevant. The PRA also "is not meant to allow an end-run around discovery rules or determinations." *Shlansky v. City of Burlington*, 2010 VT 90, ¶ 8, 188 Vt. 470.

Requestor emphasizes that work product immunity in Vermont is "narrow" and can only apply to litigation that is "*in esse,*" by which it means *already underway*. Requestor borrows those insights from *Killington, Ltd. v. Lash*, 153 Vt. 628 (1990). In *Killington*, the Court clarified that work product immunity existed in the common law of Vermont prior to its express incorporation into the civil rules, regardless that there were no reported cases to that effect. The Court also clarified that it protects the work of government lawyers and is within PRA Exemption 4. *Id*. at 643–44. After those essential holdings, the Court further stated in dicta: "We must emphasize that the work product exemption is a narrow one, both under *Hickman* principles and the civil rules. The litigation which serves as the basis for the claim must be *in esse* and not merely threatened." *Id*. at 647.

---

[4] Requestor, in fact, attempts no such showing in this case.

Narrowness aside, Requestor interprets the *Killington* Court's expression *in esse* to mean that the litigation for which the work product was prepared must be ongoing—not merely anticipated—to invoke immunity.[5]  This is a misunderstanding of the *Killington* decision.  The *Killington* Court cited to *Grolier Inc. v. F.T.C.*, 671 F.2d 553 (D.C. Cir. 1982), in support of the proposition that the litigation must be *in esse*.  *Grolier* never used that expression or included any holding to that effect.  The relevant issue in *Grolier* was whether immunity continues *after the relevant litigation has terminated*, not whether immunity can apply in the case of anticipated litigation.  The *Grolier* court ruled that "attorney work-product from terminated litigation remains exempt from disclosure only when litigation related to the terminated action exists or potentially exists."  *Id*. at 556; but see U.S. D.O.J., Exemption 5 Attorney Work-product Privilege, 2014 WL 2441143, at *3 (explaining that on review of the *Grolier* case, the U.S. Supreme Court "resolved a split in the circuits by ruling that the termination of litigation does not vitiate the protection for material otherwise properly categorized as attorney work-product").  This appears to be what the *Killington* Court was referring to, albeit confusingly.  More importantly, the *Killington* Court clearly was adopting the conception of work product immunity as described in *Hickman v. Taylor*, 329 U.S. 495, which arose out of a controversy about witness statements taken in anticipation of litigation, not after a lawsuit had already been filed.  It also expressly referred to work product immunity in Rule 26, which also plainly applies to material "prepared in anticipation of litigation."  V.R.C.P. 26(b)(4).  Work product immunity in Vermont extends to materials prepared in anticipation of litigation, not merely those materials prepared after a lawsuit has been filed, and it continues following the termination of the litigation.

*The common interest doctrine*

The State argues that the court should extend the work product doctrine by application of the so-called the common interest rule or doctrine, a matter about which the court took evidence.  The doctrine, substantially, is as follows:

> If two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged . . . that relates to the matter is privileged as against third persons.  Any such client may invoke the privilege, unless it has been waived by the client who made the communication.

Restatement (Third) of the Law Governing Lawyers § 76.  Common Interest Agreements (CIAs) are widely used by Vermont and other state AGs to memorialize such common interests.  The agreements involved in this case are in writing and are sufficiently commonplace as to be produced with boilerplate language.

---

[5] The *Killington* Court's description of the character of work product, as opposed to just anything in the possession of a lawyer, appears to be what it meant by "narrow."  Requestor has not explained what it believes "narrow" means in Vermont other than by its arguments above.  The court believes that work product immunity in Vermont is as described under the civil rules, where they apply, and otherwise is generally consistent with the common law conception of it under *Hickman* and progeny.

The 7 CIAs at issue, and the documents and communications produced and exchanged under them, are all directed at issues concerning the general subject of combatting global warming in some fashion and are, with one exception, agreements among AG offices in different states. (One case also involves auto manufacturers who have a common interest with states in the standardization of regulation.) Consumer protection cases are another area where CIAs are commonplace, though that is not the subject matter here.

The practice of the AGO is that when issues of cooperation with other AGs are presented to a line litigation attorney, such as AAG Persampieri, he notifies his supervisor. The supervisor directs the request further up the office hierarchy, and a decision is made as to whether the issue is one which advances the interests of Vermont and whether the office has sufficient resources to devote to that particular matter in light of its other commitments. The criteria for making such a decision are not written. The court is mindful that the Vermont Attorney General has very broad discretion to act as he or she sees fit in the interest of the State. See 3 V.S.A. § 159 ("He or she shall have general supervision of matters and actions in favor of the State and of those instituted by or against State officers wherein interests of the State are involved and may settle such matters and actions as the interests of the State require."). It is neither this court's nor Requestor's office to tell the AG how to exercise that discretion.

The AGO has entered into CIAs in the past in such national scale litigation as the so-called tobacco litigation, the V.W. defeat device and Harley Davidson defeat device litigation, as well as a number of consumer rights and environmental litigation matters. In some of the cases, substantial monetary recoveries have occurred on behalf of Vermont or Vermont consumers. Vermont has joined with others in 55 suits since 2017 and has filed 35 amicus briefs and signed onto 132 comment letters to agencies. The ability to join with other AGs expands the scope of what Vermont can take on and leverages resources for each state joining such litigation.

A number of the 7 CIAs in this case have a common genesis in changes in energy policy occasioned by the Trump administration. In multiple cases, the Vermont and other AGs believed the changes in policy were ill-advised and not in the interest of Vermont (and respective other states) as part of a national and global community because of the long term effects of climate change. In such context, the work of the AGO in these cases can well be viewed as "political." However, this court does not believe that label helps evaluate the scientific basis for the action of the AGO in these cases.

As noted by a prior judge in similar litigation, Vermont has not adopted the common interest doctrine under Exemption 4. *Energy & Environment Legal Institute v. The Attorney General of Vermont*, No. 558-9-16 Wncv, at 3 (Vt. Super. Ct. July 27, 2012) (Teachout, J.) ("Such doctrine has not been recognized as a privilege under Vermont law nor adopted in any reported decision."). The PRA's admonition to interpret it liberally, especially in light of Vermont's constitutional proclamation that governmental officials are answerable to the people, should cause any court to tread lightly when considering the expansion of privileges. However, this case does bring the problem into focus: resolution of large legal issues involving big entities such as state and national agencies and large well-moneyed corporations must be seen as asymmetric litigation (similar to

asymmetric warfare). The court means that, for example, litigation in its broadest sense frequently starts in places other the courtroom and can involve proxies. Thus, public records requests may well be a part of such efforts, and that reality causes the AGO and others, most of whom have some form of public records act, to resort to the CIAs to guard against disadvantageous disclosure.

This case has a recent analogue in *Minnesota* in the matter of *Energy Policy Advocates v. Ellison*, No. A20-1344, 2021 WL 2200414 (Minn. Ct. App. June 1, 2021). There, the same Requestor as in this case sued the Minnesota AG under that state's public records law seeking, in part, communications between various state AGs under a CIA. Minnesota law, similar to Vermont law, allowed work product immunity and attorney–client privilege (among others) to be asserted in response by legal professionals. The Minnesota AG asserted, as the AGO does here, work product immunity, attorney–client privilege, and the common interest doctrine. The trial court in fact adopted the common interest doctrine.

The Minnesota court of appeals, however, noted that the common interest doctrine had not been adopted in Minnesota and declined to so extend the common law, reasoning that only the legislature or its supreme court could do so. *Id*. *13. It went on to say that even if it were to apply the doctrine, the doctrine would not shield communications by Minnesota attorneys communicating with those of other states' AG offices because the doctrine does not extend to work product. Citing the Restatement of the Law Governing Lawyers § 76, it explained that the doctrine merely prevents the waiver of attorney–client privilege when relevant disclosures are made. The court did not grapple with the obvious wrinkle, however: that an AG frequently, such as in this case, stands in the shoes of both attorney and client at the same time.

In any event, the Restatement elaborates on the doctrine as follows:

> Under the privilege, any member of a client set—a client, the client's agent for communication, the client's lawyer, and the lawyer's agent (see § 70)—can exchange communications with members of a similar client set. However, a communication directly among the clients is not privileged unless made for the purpose of communicating with a privileged person as defined in § 70. A person who is not represented by a lawyer and who is not himself or herself a lawyer cannot participate in a common-interest arrangement within this Section.

> . . . . The communication must relate to the common interest, which may be either legal, factual, or strategic in character. The interests of the separately represented clients need not be entirely congruent.

Restatement (Third) of the Law Governing Lawyers § 76 cmt. d and e. And one court has cautioned that "common interest assertions by government agencies must be carefully scrutinized. For the doctrine to apply, an agency must show that it had agreed to help another party prevail on its legal claims at the time of the

communications at issue because doing so was in the public interest.  It is not enough that the agency was simply considering whether to become involved." *Hunton & Williams v. U.S. Dep't of J.*, 590 F.3d 272, 274 (4th Cir. 2010).

The common interest doctrine enhances the attorney–client privilege by modifying its otherwise relatively strict and broad waiver rules, especially with regard to disclosures to third parties, enabling otherwise third parties to collaborate.  See Restatement (Third) of the Law Governing Lawyers §§ 77–80 (waiver).  Work product immunity, on the other hand, is not waived in the event of disclosure to a third party unless the circumstances are such that "there is a significant likelihood that an adversary or potential adversary in anticipated litigation will obtain it."  Restatement (Third) of the Law Governing Lawyers § 91(4).

Thus, the common interest doctrine is not necessary to the assertion of work product immunity.  Similarly, reducing common interests to writing, such as in the disputed CIAs, is not necessary to an assertion of work product immunity.  However, the CIAs in this case *are* clear and certain evidence of the relevant common interests and intended scope of communications as well as the mutual intent to keep those communications confidential in preservation of the collaborating parties' litigation interests.

*The CIAs and withheld communications within their scope*

Ultimately, the court concludes that it can analyze this case properly with resort to work product immunity only.  There is no need to resort to attorney–client privilege or to determine whether to modify the traditional privilege by application of the common interest doctrine.

The State argues that the CIAs themselves are protected work product—tangible or intangible material produced in anticipation of litigation.  The CIA index describes each such CIA in detail and explains that all parties to each CIA understood and intended that the CIA and shared communications and materials thereunder would be treated as confidential.  Mr. Persampieri, in his affidavit, plainly asserts that each such CIA was entered into in relation to, at the time, ongoing or reasonably anticipated litigation.

However, the court declines to rule that these CIAs themselves are exempt work product under Exemption 4.  The State has a statutory responsibility to respond to PRA requests by producing the requested documents or explaining why not *with specificity*.  1 V.S.A. § 318(b)(2), (c)(2).  The CIAs in this case do little more than describe the general scope of the signatories' common litigation interests, desire to collaborate and communicate about them for litigation purposes, and desire to keep such collaboration and communications confidential.  They do not in any appreciable way reveal legal strategy, legal opinions, or any other information sensitive to the signatories' legal interests other than the identification of the common interest.  In other words, the CIAs do little, if anything, more than document in writing in advance the assertion of work product immunity that the signatories may assert later in response to a public records request, all basic information

Order
173-4-20 Wncv Energy Policy Advocates vs. Attorney General's Off

Page **9** of **13**

that the State should be required to produce anyway to document specifically its refusal to produce the subsequent communications undertaken within the scope of those agreements.

The court concludes that all 7 CIAs are not exempt under Exemption 4 and must be produced promptly.

All other withheld materials are exempt work product. According to the index and Mr. Persampieri's affidavit, all such communications were sent or received by him, all occurred in reliance on the 7 CIAs withheld in this case, or others that had not been requested, and all such communications, when made, related to ongoing or anticipated litigation.

There is no basis for any waiver of work product immunity in the record. The AGO has not produced the withheld material to Requestor or to anyone else who it reasonably should have known would voluntarily make it available to Requestor.

Requestor further argues that (1) Mr. Persampieri's affidavit does not affirmatively demonstrate that all possibly responsive documents have been identified; (2) the AGO's work product argument is overbroad insofar as it applies to political rather than legal activity; and (3) it is also overbroad to the extent that it is being extended to litigation by third parties to which the AGO is not involved.

*Adequacy of search for records*

Requestor argues that the AGO has an affirmative obligation to demonstrate that it has reasonably and thoroughly sought to identify all records responsive to the requests, and it asks the court to order the AGO to make such a showing, suggesting that without it the adequacy of the AGO's indexes of withheld records is suspect. The court declines to go down that road in this case. Nothing in the record provides any basis for concern over the reasonableness of the AGO's search for records, and there is no specific controversy in that regard other than Requestor's vague suspicions. The AGO and its affiant, Mr. Persampieri, are presumed to have acted in good faith. Absent any reason to think that the search for records may have been deficient, that presumption is sufficient to demonstrate adequacy.

*Political rather than legal activity*

Requestor argues that the AGO has asserted work product immunity to lower the veil of secrecy improperly over its political activities rather than properly over its legal activities. Others have characterized, or disparaged, the increasing use of multistate collaborations by attorneys general as *attorney general*

*activism*.  See generally John W. Suthers, The State Attorney General's Role in Global Climate Change, 85 Denv. U. L. Rev. 757 (2008).  The emergence of such multistate litigation has been briefly summarized as follows:

> Beginning early in the 1980s and without much public attention, state attorneys general began cooperating with each other in ways they never had before.  Faced with the daunting prospect of prosecuting large, wealthy, and well lawyered corporations—defendants that often have many times the financial and legal personnel resources of even a large attorney general's office—for violations of state law, state attorneys general began to reach across state lines for help.  The attorneys general began looking to other states that might be investigating similar complaints against a defendant and, in groups ranging from two states to all fifty, started to prosecute their cases jointly, sharing with each other legal theories, discovery materials, court filings, litigation expenses, and even staff.  This type of cooperative law enforcement activity among state attorneys general became known as multistate litigation.  In this litigation, each state is the plaintiff in its own case but the coordination among the attorneys general is close.  Usually, the offices are so closely coordinated that those participating in the case will choose one or two lead states and cede to them primary responsibility for negotiating with the defendant on behalf of all the states involved.  Over the past two decades, multistate litigation has grown to become a powerful and commonly used law enforcement tool.

Jason Lynch, Federalism, Separation of Powers, and the Role of State Attorneys General in Multistate Litigation, 101 Colum. L. Rev. 1998, 2003–04 (2001); see also Margaret Lemos and Earnest Young, State Public-Law Litigation in an Age of Polarization, 97 Tex. L. Rev. 43 (2018).  This type of litigation appears to be what Requestor means by "political."  A number of states banding together to attempt to wage some sort of lawsuit or lawsuits addressing an issue that affects everyone regardless of state lines, such as global warming, certainly may have a "political" component or motivation, and as explained in the articles is undertaken freely by both sides of the aisle.

But Requestor's argument presents a false dilemma in the context of this case.  Neither work product immunity nor Exemption 4 is predicated on any legal (immune) versus political (accessible) dichotomy.  What matters under work product immunity is that reasonably anticipated, if not currently ongoing, litigation is at issue (or was at the time of the communication), and the materials sought relate to that litigation.  The indexes and Mr. Persampieri's affidavit clearly show that the materials withheld here are work product regardless of what political interests one may think motivated the litigation interests.

*Litigation with which the AGO is uninvolved*

Requestor also argues that the AGO's work product immunity argument is overbroad because it cannot extend to litigation with which the AGO is simply uninvolved.  The short answer to this argument is that there is no such litigation at issue in this case.  As described above, the indexes and Mr. Persampieri's affidavit clearly show that all the materials withheld in this case relate or related to ongoing or anticipated litigation.

Requestor's mere speculation to the contrary, despite the express representations in Mr. Persampieri's affidavit, is insufficient to cause the court to look behind the AGO's representations to determine whether any anticipated litigation is or was anticipated enough. The attorneys representing the AGO in this case, as well as Mr. Persampieri, are officers of the court, they are subject to Rule 11, and the court does not presume that they have acted in bad faith or with any intent to evade the AGO's obligations under the PRA or to deceive the court. Requestor's mere speculation is insufficient to warrant in camera review of thousands of documents.

The withheld materials—other than the CIAs—are exempt work product.

*Requestor's Rule 56(d) motion*

Requestor's Rule 56(d) motion is moot. It has had every opportunity and plenty of time to present any evidence or argument it likes as to events unfolding out of state or otherwise and to brief the issues in this case, which are fundamentally legal in nature. As set forth above, there is no need for discovery into the adequacy of the State's search for responsive records.

Order

For the foregoing reasons, the State's motion for summary judgment is granted in part and denied in part as set forth above. The State shall produce the 7 CIAs promptly.

Robert R. Bent,
Judge

Order
173-4-20 Wncv Energy Policy Advocates vs. Attorney General's Off

Page **12** of **13**