Filed 05/07/25

| VERMONT SUPERIOR COURT | | CIVIL DIVISION |
|---|---|---|

**VERMONT SUPERIOR COURT**
Washington Unit
65 State Street
Montpelier VT  05602
802-828-2091
www.vermontjudiciary.org



**CIVIL DIVISION**
Case No. 24-CV-02754

---

American Civil Liberties Union Foundation of Vermont v. Vermont Department of Health et al

---

<u>Opinion and Order on Defendants' Motion to Dismiss</u>

In 2022, the legislature created a special fund known as the Opioid Abatement Special Fund (the Fund), consisting of "all abatement account fund monies disbursed to the Department [of Health] from the national abatement account fund, the national opioid abatement trust, the supplemental opioid abatement fund, or any other settlement funds that must be utilized exclusively for opioid prevention, intervention, treatment, recovery, and harm reduction services."  18 V.S.A. § 4774(a)(1); *see also* 32 V.S.A. §§ 585–588 (administration of "special funds" generally).  The legislature also created a system by which annual recommendations for expenditures of Fund resources would be made to the legislature from both a newly created Opioid Settlement Advisory Committee (Committee) and, separately, the Department of Health (Department).  This case arises out of that recommendation process as it unfolded in December 2023 and January 2024 with respect to fiscal year 2025 expenditures.

Plaintiff American Civil Liberties Union Foundation of Vermont (ACLU) believes that, during that time, the Office of the Governor, acting through the Department and Commissioner Levine, improperly usurped and perverted the Committee's principal function.  That view informs the open meeting law claims that it raises in this case and

led it to request public records that were, in part, denied under an assertion of executive privilege. The ACLU also challenges in this action that latter withholding of records.

The ACLU's claims under Vermont's Open Meeting Law (OML), 1 V.S.A. § 310–314, are asserted against both the Committee and the Department. Its public records claim is asserted solely against the Department. 1 V.S.A. §§ 315–320 (Public Records Act or PRA). Also named as a defendant is Dr. Mark Levine, Commissioner of the Vermont Department of Health, in his official capacity only. There is no meaningful difference between Commissioner Levine in his official capacity and the Department itself (or the Committee, of which he was chair, at least in this particular context). *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." (citation omitted)).

The Committee and the Department are separate governmental entities with potentially disparate interests. In this action, though, they are jointly represented, have jointly filed a motion to dismiss both the OML and PRA claims, and take no differing positions on any issues. They argue that the OML claims misunderstand what actions were taken by the Department as opposed to the Committee, and the partially unsatisfied records request is subject to executive privilege.

I.     Procedural Standard

A motion to dismiss for failure to state a claim faces a high bar. The Vermont Supreme Court has described the familiar standard for Rule 12(b)(6) motions to dismiss for failure to state a claim as follows:

> A motion to dismiss . . . is not favored and rarely granted. This is especially true when the asserted theory of liability is novel or extreme, as such cases should be explored in the light of facts as developed by the evidence, and, generally, not dismissed before trial because of the mere novelty of the allegations. In reviewing a motion to dismiss, we consider whether, taking all of the nonmoving party's factual allegations as true, it appears beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief. We treat all reasonable inferences from the complaint as true, and we assume that the movant's contravening assertions are false.

*Alger v. Dep't of Labor & Indus.*, 2006 VT 115, ¶ 12, 181 Vt. 309, 316–17 (citations and internal quotations omitted); *see also* 5B A. Benjamin Spencer, *et al., Fed. Prac. & Proc. Civ.* § 1357 (4th ed.) ("Ultimately, the burden is on the moving party to prove that no legally cognizable claim for relief exists."). In examining such a motion, the Court is not required to accept bald legal conclusions unsupported by any factual allegations, however. *Colby v. Umbrella, Inc.*, 2008 VT 20, ¶ 10, 184 Vt. 1, 9.

The record for Rule 12(b)(6) purposes generally is limited to the four corners of the complaint and any attachments to it. *See Nash v. Coxon*, 152 Vt. 313, 314–15 (1989).

## II. Analysis

### A. Opioid Settlement Statutes

To fairly understand the claims in this case, it is important first to understand the statutory regime related to disbursements from the Fund. In 2022, the legislature created the Fund, the Committee, and the process by which the legislature annually receives recommendations for expenditures from the Fund. 2021, No. 118 (Adj. Sess.), § 1 (adopting 18 V.S.A. §§ 4771–4774). Those statutes were amended once before the events of this case: 2023, No. 22, § 13. They have been amended three times since: 2023, No. 85 (Adj. Sess.), § 51; 2023, No. 87 (Adj. Sess.), § 82; 2023, No. 113 (Adj. Sess.), §

E.312.1. For purposes of this case, all references to 18 V.S.A. § 4771–4774 are to the versions in the original enactment as modified by 2023, No. 22, § 13.

The general purpose of the Committee is "to provide advice and recommendations regarding remediation spending from" the Fund. 18 V.S.A. § 4772(a). The Committee is its own entity but receives "administrative, technical, and legal assistance" from the Department. *Id.* § 4772(d). Its members are set forth at § 4772(b)(1) and include "the Commissioner of Health or designee, who shall serve as a nonvoting chair." *Id.* § 4772(b)(1)(A). Commissioner Levine, in fact, served as chair during the underlying events. The Committee is charged with consulting with stakeholders, *id.* § 4772(c), during the course of the year; and with identifying "spending priorities as related to opioid use disorder prevention, intervention, treatment, and recovery services and harm reduction strategies for the purpose of providing recommendations to the Governor, the Department of Health, and the General Assembly on prioritizing spending from the [Fund]," *id.* § 4772(c).

"Annually, the . . . Committee shall present its recommendations for expenditures from the [Fund] to the Department . . . and *concurrently* submit its recommendations *in writing* to the House Committees on Appropriations and on Human Services and the Senate Committees on Appropriations and on Health and Welfare." *Id.* § 4772(e) (emphasis added).[1] The statutes say nearly nothing as to the procedures the Committee should use to arrive at and report its recommendations. It does say that the Committee's meetings "shall be consistent with" the OML, *id.* § 4772(f)(4), and that the Committee

---

[1] The Committee's recommendations to the Department are *not* expressly, statutorily required to be in writing.

"shall adopt procedures to govern its proceedings and organization, including voting procedures," *id*. § 4772(f)(3).

Separately, the Department, on or before January 15 of each year, submits to the legislature a "spending plan . . . informed by" the Committee's recommendations. *Id*. § 4774(a)(2). If the legislature thereafter makes a specific appropriation for funding from the Fund, the Department then requests "to have the funds formally released from the national abatement account fund, the national opioid abatement trust, the supplemental opioid abatement fund, or any other settlement funds that must be utilized exclusively for opioid prevention, intervention, treatment, recovery, and harm reduction services" and disburses such funds to the Fund. *Id*. § 4774(a)(2); *see also* 18 V.S.A. § 4773 (designating the Department "as the lead State agency and single point of contact for submitting requests for funding to the national settlement fund administrator"). "Disbursements from the [Fund] shall supplement and not supplant or replace any existing or future local, State, or federal government funding for infrastructure, programs, supports, and resources, including health insurance benefits, federal grant funding, and Medicaid and Medicare funds." *Id*. § 4774(a)(3). In other words, the Fund is supposed to be used for new programs and services rather than as a source of funding for programs and services already otherwise funded or anticipated to be funded.

It is plain that the Committee's general purpose is to make nonbinding recommendations for programs and services funded through the Fund that would not otherwise have funding, and the Department's role is to seek formal funding for its own recommendations for such programs and services that are "informed by" but not necessarily determined by the Committee's recommendations. The Department's request

to the legislature is due by January 15, so the Committee's recommendations must be reported sometime before that. Ultimately, the legislature makes the final call on how settlement funds are spent after receiving the recommendations.

### B.  The Allegations

The complaint includes extensive allegations as to what happened from December 2023 through March 2024 and is supplemented by 20 attachments. The appearance is that leading up to those events, the Committee had never adopted any written "procedures to govern its proceedings and organization, including voting procedures," 18 V.S.A. § 4772(f)(3), but had generally agreed to proceed according to Robert's Rules of Order. It is unclear whether or how it implemented Robert's Rules, as it appears to have conducted no formal votes to that effect.

Per the allegations of the complaint, the Committee's final meeting of 2023, on December 22, was intended to finalize its FY25 recommendations. Leading up to the meeting, an administrator had circulated to members a "recommendations matrix" including dozens of individual initiatives that had been under consideration. Members were to rank the initiatives prior to the December 22 meeting. One of the two most highly ranked initiatives was a proposal to spend approximately $2.6 million establishing 2 opioid prevention centers (OPCs), described as "supervised consumption facilities where trained staff can connect individuals to services and intervene in the event of an overdose or medical emergency."

According to the ACLU, it was clear among those members at the December 22 meeting that their rankings for matrix purposes were not formal votes as to the Committee's recommendations, and it was understood that there would be a subsequent

opportunity, after receiving input from three absent members, for everyone to formalize the Committee's recommendations. After that, a letter would be drafted presenting those recommendations to the legislature. Despite the lack of formal voting, there was a general consensus at the meeting as to the Committee's top recommendations in general and as to its enthusiasm for the OPC recommendation in particular.

At the time, the legislature was considering, and the Committee was well aware of, H.72 (2023), which would have created OPCs without the use of Fund resources. *See* 2023, H.72, § 6 (as passed by House) (using Evidence-Based Education and Advertising Fund resources for OPCs).

Following the Committee's December meeting and without further consulting the Committee, Dr. Levine drafted a letter from him to the Senate and House Appropriations Committees, the subject line of which was "Opioid Settlement Funding Recommendations for Fiscal Year 2024." The Letter concludes with this: "Pursuant to 18 V.S.A. § 4774(a)(2), the Department, having been informed by the recommendations of the Committee, hereby requests the authorization to $4,903,962 from the [Fund] to support [the proposed] initiatives in fiscal year 2025."

Those Departmental proposals are generally consistent with the Committee's rankings as expressed in the Committee's recommendations matrix but OPCs are omitted entirely and, according to the allegations, certain other policy choices inconsistent with the Committee's rankings are apparent. OPCs were addressed in the Letter, however. As to OPCs, it explains:

> One of the highest tier priority recommendations from the committee that does not appear in this letter is for the funding of two overdose prevention centers. It is clear that the legislature plans to fund these centers from a non-settlement source [a reference to H.72]. Therefore, in keeping with

principle one ["Spend money to save lives; use the funds to supplement rather than replace existing spending."], we have excluded this from the current set of recommendations for use of settlement funds so as to maximize our ability to support a broad array of initiatives. The committee heard testimony on and/or directly discussed over 30 proposals. Those that are detailed below were clearly those that committee members overwhelmingly felt should be considered the highest priority for Vermont's use of settlement funds in fiscal year 2025. These proposed initiatives will be evaluated for outcomes and effectiveness.

A copy of the Letter was sent to Committee members on January 12. The cover letter accompanying it explains as follows:

I will call your attention to the following:

1. OPCs are not included as a spending request. This is because H.72 contains a provision for an alternate financing mechanism, mainly through the Education and Research Fund that the pharmaceutical companies routinely pay into each year. I look at this favorably, as it provides us with more opportunities to fund a broader array of initiatives across the continuum. Please note that I did clearly delineate the committee's position on OPCs.

2. The other 4 areas receiving highest priority from committee actions (expanding methadone access in Burlington, stabilization beds, MMRP, and recovery housing stipends) remain as discussed with one exception. That is in the expanded access to methadone in the existing hub in Burlington. The Governor was concerned that other hubs have an opportunity to expand staff or hours in the same way as Burlington has considered. This seems quite reasonable and more equitable, even though none have made requests to us. Because there may be interest, an RFP or other such process may reveal this. I therefore increased the amount of the request from $500,000 to $900,000.

3. Removing OPCs from the menu frees up $2.6 million. To further broaden our recommendations, I looked at the remaining initiatives that had a high number of Tier 1 and Tier 2 votes. It was quite clear that there were 3 items that stood out far ahead of all the others. They were VCJR, ongoing and expanded funding of contingency management, and primary prevention in the form of expanding Student Assistance Professionals and school-based services. These conveniently and almost perfectly fit into the $2.6M available—I only had to decrease the prevention dollars from the $1.58M requested to $1.429M, which the sponsor of the initiative stated would not pose any problem.

4. All of the above requests enjoy support from the Governor.

Without further interactions with the Committee, Dr. Levine sent the Letter to the appropriations committees on January 16.

The ACLU alleges that the Letter was drafted so that it appeared to be sent from the Committee and to reflect that the Committee's recommendations and those proposed with the Letter were identical. It was, in the ACLU's view, an act of the Committee rather than the Department. The Department and the Committee, instead, take the position that the Letter was reporting the Department's proposed spending plan only. In their view, it was an act of the Department rather than the Committee.

Another issued raised in this action concerns the minutes of the Committee's December 22 meeting. The Minutes of that meeting were not posted on the Committee's website until January 29. As to what happened at the meeting, the minutes, in total, say: "The entire meeting was an open discussion about the funding proposals. Consensus on the recommendations the committee rated highest priority was achieved." It continues, briefly: "Dr. Levine will formulate a letter to the Appropriations Committee Chairs, which will be run by the committee when ready." Next to the minutes is a link to the Letter. There never has been a link posted to the oral recording of the December 22 meeting.

On January 29, 2024, the ACLU submitted a public records request to the Department that sought, among other records, the following:

> All records and correspondence between, among, or including Committee Members regarding the Committee's Funding Recommendations for Fiscal Year 2025, including attachments.
>
> > This request includes, but is not limited to, any records or correspondence concerning prior versions of what ultimately became the

Funding Recommendations for Fiscal Year 2025 submitted to the General Assembly on January 16, 2024.

Among the materials produced in response were some heavily redacted emails. The ACLU sought review of that production by agency head Dr. Levine, who declined to produce unredacted versions under an assertion of executive privilege. The PRA dispute here is limited in scope to the appropriate breadth of that assertion of executive privilege.

In a February 15, 2025 letter to Dr. Levine, the ACLU complained that the series of events above amount to several violations of the OML, largely predicated on its view that Dr. Levine's January 16 Letter was sent on behalf of the Committee rather than the Department. *See* 1 V.S.A. § 314(b)(1) (requiring aggrieved person to give public body notice and opportunity to cure before filing suit). Dr. Levine rejected the alleged OML violations in a February 26 letter (on behalf of the Department) that concludes with this: "I will be following up with an email to the Advisory Committee that includes a copy of your letter and my response on behalf of the Department and a request that the Advisory Committee include in the agenda for its next public meeting a discussion of the issues raised in your letter. Your point that 18 V.S.A. § 4772 requires the Advisory Committee to submit its own recommendations in writing to the Legislature should be addressed by the members of the Advisory Committee in the context of a public meeting."

The Committee's next meeting, its first since the December meeting, was on March 25. At that meeting, a majority of Committee members, ostensibly dissatisfied with Dr. Levine's January 16 Letter, voted to send a report of its December 22 recommendations to the appropriations committees directly from itself. A member other than Dr. Levine drafted the Committee letter, which it sent to the legislature on April 23, 2024. The April 23 Letter expressly states that it is from the Committee itself.

If any readers of Dr. Levine's January 16 Letter were confused as to whether he was speaking for the Department or the Committee, that circumstance may have been compounded by the Committee's April 23 Letter. It provides, in pertinent part, as follows:

Consistent with 18 V.S.A. § 4774(a)(2), the purpose of this letter is to describe the appropriations recommended by the Opioid Settlement Committee to the Vermont General Assembly for Fiscal Year 2025. Although the decision to submit a letter separate from one submitted by Dr. Levine on behalf of the Vermont Department of Health and informed by the Opioid Settlement Committee recommendations, was not unanimous, the majority of the Committee voted to draft and submit its own letter of funding recommendations. This letter has been circulated to all Committee members with an opportunity to offer edits. The final letter was voted on and approved by a majority of the Committee membership.

The Committee acknowledges that these recommendations should have been transmitted to the General Assembly on or before December 2023, however, with some months ahead before the final appropriations bills are settled and sent to the Governor, the Committee hopes these recommendations for appropriations from the Opioid Abatement Special Fund will be considered.

The committee heard testimony on and/or directly discussed over 30 proposals, and strongly feels that these initiatives described below should be considered the highest priority for Vermont's use of settlement funds in fiscal year 2025.

The listed initiatives each received a Tier 1 ranking from at least 8 of the 12 committee members. One of the highest tier priority recommendations is for the funding of two overdose prevention centers and the committee strongly recommends that the legislature fund this innovative and important strategy from settlement funds. All these proposed initiatives will be evaluated for outcomes and effectiveness.

It should be noted that these recommended appropriations differ from those communicated separately by Dr. Mark Levine, on behalf of the Vermont Department of Health and informed by the Opioid Settlement Advisory Council, as required by Act 118 of 2022, on January 16, 2024, in the following ways:

• Includes $2,600,000 for Overdose Prevention Centers

· Reduces the recommendation for Recovery Housing, as this item received only half of the committee's support (from 6 of 12 members). Removes appropriations for Expansion of Student Assistance Professionals/Schools Based Services, Ongoing Support for Contingency Management, and Vermonters for Criminal Justice Reform (VCJR) which are valuable initiatives and were supported by many members but did not receive a majority of committee support but were identified as the next tier of supported recommendations in an individual ranking exercise undertaken by the full Committee.

. . .

Pursuant to 18 V.S.A. § 4774(a)(2), the Department, having been informed by the recommendations of the Committee, hereby requests the authorization to spend $4,903,962 from the Opioid Abatement Special Fund to support these initiatives in fiscal year 2025.[2]

While the Committee's letter clearly distinguishes its view of its recommendations from those of the Department as asserted in Dr. Levine's January 16 Letter, it incorrectly cites to 18 V.S.A. § 4774(a)(2) to explain why it is submitting its report to the appropriations committees and then expressly purports to be speaking for the Department in the final sentence quoted above.

As noted above, though, the Committee's reporting requirement is in 18 V.S.A. § 4772(e). The Department's separate duty to propose a spending plan for its "informed" recommendations is at § 4774(a)(2). And the Committee has no more authority to speak for the Department than the Department has for the Committee.

---

[2] Ironically, perhaps, after the Committee sent its letter, the legislature amended the funding mechanism in H.72 to use Fund resources for OPCs rather than non-Fund resources, in apparent conflict with the guiding Fund principle that its resources should be used only to "supplement and not supplant or replace any existing or future local, State, or federal government funding for infrastructure, programs, supports, and resources, including health insurance benefits, federal grant funding, and Medicaid and Medicare fund." 18 V.S.A. § 4774(a)(3). The Governor eventually vetoed H.72, and the legislature then overrode the veto. H.72 thus became Act 178, with a $1.1 million appropriation from the Fund for OPCs and another $300,000 appropriation from the Fund to study them. 2023, No. 178 (Adj. Sess.), §§ 2(a), (4).

C.    The OML Claims

As a preliminary matter, the Court notes that the ACLU has asserted its OML claims against both the Committee and the Department. The claims are properly asserted against the Committee only. The only "public body" that arguably has violated the OML is the Committee, not the Department. 1 V.S.A. § 310(6). Accordingly, the OML claims, as asserted against the Department, are dismissed.

As to the Committee, in the ACLU's view, Dr. Levine's January 16 Letter was, in fact, written and sent in his capacity as chair of the Committee to present the Committee's FY25 recommendations, and the changes it made to the Committee's recommendations (to the extent they were apparent at its December 22 meeting), constitute unilateral actions by Dr. Levine that substantively changed the Committee's recommendations. First, it claims that 1 V.S.A. § 312 required such action to be conducted by the Committee in an open manner rather than behind closed doors as undertaken by Dr. Levine. Second, it asserts that Dr. Levine's January 12 email to the Committee, with the draft of what became the January 16 letter, was a communication to a quorum of Committee members "for the purpose of discussing the business of the public body" that was required to be a publicly noticed meeting of its own. Third, it contends that the minutes of the Committee's December 22, 2023 meeting are substantively inaccurate and were not posted in a timely manner in violation of the OML.[3] The

---

[3] It is unclear why the timing of the Committee's posting of the minutes of its December 22 meeting would be at issue here. The ACLU asserts that the minutes were posted on January 29. Even if late, that was *before* it notified Dr. Levine of any alleged OML violations. Any timeliness violation was cured before any controversy was presented. It is unclear what relief the ACLU contemplates here as the timeliness issue, and the Court sees no basis upon which to afford any.

premise to the first claim and, to some extent, the second and third, is that Dr. Levine modified the Committee's December 22 recommendations and drafted the January 16 Letter and sent it to the legislature all on behalf of the Committee rather than the Department.

The relevant statutes provide clear guidance as to what was expected of the Committee and the Department. They provide for two sets of recommendations: those produced by the Committee and those produced by the Department. The Department's recommendations are required to be "informed by" the Committee's recommendations, but the Committee's recommendations do not determine the Department's recommendations. Similarly, the Committee and the Department have separate duties to report their recommendations to the legislature, and the Committee's report must precede the Department's (due no later than January 15) if it is to inform the Department's recommendations. In this instance, the only report of recommendations anyone made to the legislature anywhere near the Department's January 15 deadline, was Dr. Levine's January 16 Letter. By that time (or the day before), there should have been two written reports, one from the Committee and one from the Department.

The ACLU's insistence that the January 16 Letter was submitted on behalf of the Committee, though not without some support, is not persuasive at the end the end of the day. Read in full, the Letter is decidedly from Dr. Levine in his capacity *as Commissioner* and reflects the recommendations *of the Department*. No doubt, the ACLU has reasonable grounds to point out possible grounds for confusion: Dr. Levine is both the Chair of the Committee and the head of the Department; while the Letter notes differences with the Committee's recommendations, it was not carefully drafted to

delineate differences between the Committee and the Department; some verbiage used in the Letter is admittedly confusing in that regard; and the potential confusion is exacerbated by the lack of a prior and separate submission by the Committee. In the final analysis, however, the Letter clearly purports to be proposing the 18 V.S.A. § 4774(a)(2) spending plan over which the Department has exclusive authority and the Committee has none. Indeed, it is submitted on Department letterhead; from "Mark A. Levine, MD, Commissioner;" and ends by noting specifically that it is a funding request from "the Department," after considering recommendations of "the Committee," and is submitted pursuant to the Department's responsibility under "18 V.S.A. § 4774(a)(2)." Only the Department is empowered to make recommendations under § 4774(a)(2), and those recommendations are required by statute to be "informed by" the Committee's recommendations, which provides some explanation for the Letter's references to the Committee. In the Court's view, the Letter presents the Department's statutory recommendations.

Moreover, the Committee expressly, though belatedly, determined to send its own letter, apart from the Department's January 16 Letter, at its March 2024 meeting. It also recognized at that meeting and in its letter that the January 16 Letter was the Department's, not the Committee's, submission. And, however confusing the specifics of the Committee's letter was, that letter clearly distinguished its recommendations from the Department's recommendations that had been presented in the January 16 Letter. It also formally acknowledged in its letter that the January 16 Letter was from the Department. It describes the January 16 Letter as having been sent "by Dr. Levine on

behalf of the Vermont Department of Health and informed by the Opioid Settlement Committee recommendations."

Consistently, both the Department and the Committee in this litigation have confirmed their positions that the January 16 letter was sent to satisfy the Department's obligation to make recommendations exclusively, and the Committee's later letter was sent to present its different recommendations. Between the Committee and the Department, there is no confusion as to whose letter was whose.

The ACLU's contention that Dr. Levine was acting for the Committee rather than the Department by changing the Committee's recommendations and sending the January 16 Letter to the legislature is belied by the Letter itself and the later actions of the Committee. The January 16 Letter, and the recommendations it proposed, belong to the Department rather than the Committee. Consequently, the ACLU's first OML claim, which depends on the ACLU's presumption that those acts were the Committee's, is not viable and is dismissed.

The ACLU's second claim is that the January 12 email from Dr. Levine to the Committee members itself qualifies as a meeting under the OML and should have been conducted as such. The clarification above as to the intent and purpose of the January 16 Letter does not fully resolve this claim because the January 12 email, at least in part, is clearly a communication to a quorum of the Committee by its chair acting as such. Sending a substantive email concerning committee business to a quorum of the committee is a potential violation of the OML. To the extent the motion to dismiss addressed this issue, the Committee characterizes the email as yet one more communication from Dr. Levine exclusively in his departmental capacity. It also

suggests that it may fall within the "safe harbor" of the OML that permits sending such emails for non-substantive communications concerning scheduling matters for discussion by the public body. 1 V.S.A. § 310(5)(B).

The claim survives dismissal. While the email includes certain statements near the bottom that appear to be related to "organizing an agenda," it also distributes an apparent draft of what would become the January 16 Letter. It is not clear, however, that the letter was distributed for aid in any discussion at a meeting. Moreover, the rest of the letter is explanation by Dr. Levine about how the content was formulated. It is clear that Dr. Levine is acting or speaking as Chair of the Committee in the agenda discussion, and potentially with the distribution of material. Otherwise, the letter is ambiguous. The Court cannot resolve this matter under the dismissal standard.

The third claim is that the minutes of the Committee's December 22 meeting are inaccurate and were posted in an untimely manner.[4] As to the minutes, the OML provides as follows:

> (b)(1) Minutes shall be taken of all meetings of public bodies. The minutes shall cover all topics and motions that arise at the meeting and give a true indication of the business of the meeting. Minutes shall include at least the following minimal information:
>     (A) all members of the public body present;
>     (B) all other active participants in the meeting;
>     (C) all motions, proposals, and resolutions made, offered, and considered, and what disposition is made of same; and

[4] The Committee's lack of written policies and procedures, and the apparent informality with which it was run, at least during the underlying events, looms large over this case. According to the parties' stipulation after the March 20 hearing on Defendants' motion, the Committee "has never had a written rule or policy regarding taking, posting, or formally adopting meeting minutes." Nor does it have any "practice of formally adopting minutes at subsequent meetings." Nor did it formally adopt the meeting minutes of the December 22, 2023, meeting at its subsequent March 25, 2024, meeting. Joint Supplemental Memorandum 1–2 (filed Apr. 3, 2025).

> (D) the results of any votes, with a record of the individual vote of each member if a roll call is taken.
>
> (2) Minutes of all public meetings shall be matters of public record, shall be kept by the clerk or secretary of the public body, and shall be available for inspection by any person and for purchase of copies at cost upon request after five calendar days from the date of any meeting. Meeting minutes shall be posted no later than five calendar days from the date of the meeting to a website, if one exists, that the public body maintains or has designated as the official website of the body. Except for draft minutes that have been substituted with updated minutes, posted minutes shall not be removed from the website sooner than one year from the date of the meeting for which the minutes were taken.

1 V.S.A. § 312(b).

As to inaccuracy, the ACLU alleges: "When the Department belatedly posted minutes for its December 22 meeting, the minutes simply stated: 'The entire meeting was an open discussion about the funding proposals. Consensus on the recommendations the committee rated highest priority was achieved.'" Complaint ¶ 84 (filed July 17, 2024). The ACLU elaborates in opposition to dismissal:

> [B]y their plain text, the minutes posted fail to 'cover all topics . . . that arise at the meeting' or 'give a true indication of the business of the meeting' . . . . The 'minutes' read, in their totality: 'The entire meeting was an open discussion about the funding proposals. Consensus on the recommendations the committee rated highest priority was achieved.' This vague description fails to reflect 'all topics' discussed at the meeting; indeed, it does not describe any topic with specificity. And although the minutes state that 'consensus . . . was achieved,' that passive statement tellingly omits any discussion of what consensus the Committee reached. A Vermonter curious about the December meeting and reading the minutes would have no idea that the Committee had spent significant time emphasizing, for example, the importance of harm reduction or OPCs—among the myriad other items discussed during the two-hour-plus meeting.

The Committee's entire argument in support of dismissal of the minutes claim is a single sentence: "Finally, because the Commissioner's letter was an act of the Department, not the Committee, any deviation in the letter from the Committee's recommendation sheds no light on the accuracy of the minutes from the December 22nd

meeting." Motion to Dismiss at 8 (filed Sept. 16, 2024). The Committee does not return to the matter in its reply memorandum.

To the extent that the ACLU's inaccuracy claim depends in any way on its characterization of the January 16 Letter, the Court agrees that it is not viable in that sense. The claim is broader than that, however, and the Committee has simply not addressed the balance of the claim. Certainly, any claim of inaccuracy must be grounded in the specific requirements of 1 V.S.A. § 312(b). While minutes typically are intended primarily to make a record of actions taken, the OML also includes the requirement to "cover all topics . . . and give a true indication of the business of the meeting." This requirement must be understood reasonably. Minutes are not a transcript of the meeting. Generally speaking, a brief summary of topics addressed at an open meeting typically is sufficient.

The Court is admittedly hesitant to embark on an examination of whether minutes of public committees contain enough or sufficient detail as to any particular topic. In this case, though, it concludes that the ACLU's claim can be read to extend to a more substantive level. As such, the Court is unwilling to dismiss the claim at the threshold. The claim is not dismissed.[5]

---

[5] The OML also contains notice and cure provisions that require the aggrieved person to give the public body notice of the particular alleged OML violation and to request a "specific cure of such violation" before filing suit. 1 V.S.A. § 314(b)(1); *see also* 1 V.S.A. § 314(b)(2)–(4) (procedures for how the public may respond to such a notice). The ACLU's February 15, 2024 letter complaining of OML violations was not in any clear way directed to the Committee, or Dr. Levine as chair of the Committee. Instead, it was addressed to "Dr. Mark Levine, Commissioner of Health, Department of Health." Nor is it apparent whether any "specific cure" is mentioned in the letter. The letter variously mixes references to the Department and the Committee, but chiefly complains about the Department's alleged "lack of transparency" rather than the Committee's. Dr. Levine's February 26, 2024 response indicates that he was responding solely on behalf of the

24-CV-02754 American Civil Liberties Union Foundation of Vermont v. Vermont Department of Health et al

D.     The PRA claims

On review of the Department's initial denial of parts of the ACLU's records request, Dr. Levine asserted executive privilege on behalf of the Governor as to redacted portions of certain emails and supported that assertion with an affidavit.  *See* 1 V.S.A. § 317(c)(4) (PRA exemption for privileged records).  All the disputed emails were sent among executive branch officials, including Dr. Levine, after the Committee's December 22 meeting and before Dr. Levine's January 16 Letter.  The Department argues that Dr. Levine's invocation of executive privilege sufficiently demonstrates that those records were properly withheld for dismissal purposes.  The ACLU counters that, in Vermont, executive privilege extends exclusively to communications directly with the Governor, and the Governor was neither a direct sender nor a recipient of any of the disputed emails.  It further argues that the privilege cannot extend, as it asserts the Department is employing it, to the entire executive branch and all administrative deliberations regarding agency or departmental initiatives.  The ACLU also asserts that the privilege should not apply here because the Governor had no direct role in the Committee's undertakings, which it presumes is the subject matter of the emails.  Finally, the ACLU requests an opportunity to demonstrate a need for production regardless of the privilege if the Court concludes that the Department has made a *prima facie* showing of privilege.

In his affidavit, Dr. Levine describes the redacted emails as follows:

Department.  On the other hand, he stated that he would forward the letter to the Committee for its consideration.  Whether the ACLU's letter sent to the Commissioner is sufficient to provide notice to the Committee and whether the letter meets the requirements of § 314(b)(1) are questions that have not been addressed by the parties.  Accordingly, the Court takes no position as to those points at this time.

1. Email from Mark Levine to Monica Hutt dated January 4, 2024. Subject: High level OPC discussion.docx.

2. Email from Monica Hutt to Mark Levine and Jenney Samuelson dated January 12, 2024. Subject: RE: Draft OSAC memo. This communication has been redacted in three of the documents produced.

3. Six Emails dated January 3, 2024, between Mark Levine, Monica Hutt, Jenney Samuelson, and Shayla Livingston. Subject: for substance use briefing.

4. Six Emails dated December 28, 2023, between Mark Levine, Monica Hutt, Shayla Livingston, and Brenden Atwood. Subject: Summary of opioid recommendations.

He further asserts:

I have reviewed the redacted correspondence and can attest that the email communications and attachments are subject to Executive Privilege because they are confidential communications between myself and members of the executive branch acting in an advisory capacity to the Governor for the purpose of formulating policy and making decisions regarding opioid prevention, intervention, treatment, recovery and harm reduction service for which the Vermont Department of Health is responsible.

At the time, Monica Hutt was Vermont's Chief Prevention Officer, a position within the Office of the Secretary in the Agency of Administration. *See* 3 V.S.A. § 2321(a). Jenney Samuelson was Vermont's Secretary of the Agency of Human Services, a member of the Governor's Cabinet. *See* 3 V.S.A. §§ 2101, 3001(6). Dr. Levine, Ms. Hutt, and Ms. Samuelson are not low-ranking executive branch officials as the ACLU suggests.

The Vermont Supreme Court squarely recognized a qualified executive privilege, in the context of a PRA claim, in *Killington, Ltd. v. Lash*, 153 Vt. 628 (1990). It explained: "As objectionable as the image is of government conducted in secrecy's darkened chambers, it is hard to imagine a government functioning with no opportunity for private exchange among its ministers, with no moments of speculation, venturesome alternatives, or retractable words." *Id*. at 636–37. The privilege "protects and insulates

the sensitive decisional and consultative responsibilities of the Governor which can only be discharged freely and effectively under a mantle of privacy and security." *Id.* at 636. "It is not protection of governmental officials, but rather protection of the effectiveness of the overall governmental system that is at stake." *Id.* at 637.

When a claim of privilege is properly asserted, the withheld records are presumed privileged and the burden switches to the requestor to demonstrate its countervailing need for the records. *Id.* at 639. "The requirement that a person seeking disclosure first demonstrate need *before* obtaining the right to in camera inspection by the court is an essential part of the privilege itself, not a corollary procedure annexed to the privilege." *Id.* at 640 (emphasis added). As to breadth, the Court has explained that no specific decision of the Governor need be at issue in the communication. "A chief executive properly receives advice on important issues facing the state, even though no immediate decision may be required. The need for honest and open communication between the chief executive and advisors remains." *New England Coalition for Energy Efficiency and Environment v. Office of the Governor*, 164 Vt. 337, 342 (1995).

The Court has described a *prima facie* claim of executive privilege as follows:

> Although in *Killington* we did not address the elements of a prima facie claim of executive privilege, other courts have described the "strict procedural requirements" that such a claim must satisfy. The affidavit supporting the claim must be based on "actual personal consideration" by the responsible official. The executive must specifically identify the documents for which the privilege is claimed, and must explain why the documents are protected by the privilege.
>
> The affidavit [in *New England Coalition*] is sufficient to make out a prima facie claim of executive privilege. Volz [Director for Public Advocacy for the Department of Public Service], as a high-ranking official who was intimately involved with the preparation of the memoranda, is a proper person to assert the claim. The affidavit is based on Volz's personal knowledge of the documents, and describes those documents with

particularity. Moreover, the affidavit provides a proper basis for a claim of privilege, stating that the documents are confidential and advisory, and contain policy and legal advice.

*Id.* at 344–45 (citations omitted).

Dr. Levine's self-certification of privilege in his affidavit is sufficient to trigger the rebuttable presumption that the withheld materials are privileged. He was personally involved in all such communications, he personally reviewed them for privilege purposes, and he attests that they "are confidential communications between myself and members of the executive branch acting in an advisory capacity to the Governor for the purpose of formulating policy and making decisions regarding opioid prevention, intervention, treatment, recovery and harm reduction service."

The ACLU's argument that the Supreme Court, as recognized in a decision by this Court, has limited executive privilege to communications directly involving the Governor is incorrect. It is true that most Supreme Court cases in Vermont that discuss executive privilege have arisen, at least, mostly out of communications directly to or from the Governor, and the Court has referred to protected communications as such. It is also accurate that the Court once said, "Executive privilege, as explained in *Killington*, is limited to communications with the Governor of Vermont." *Trombley v. Bellows Falls Union High School Dist. No. 27*, 160 Vt. 101, 107 n.5 (1993).

But the question whether the privilege may apply to communications that do not directly involve the Governor has never been put to the Court squarely, and the Court has never expressly ruled on it. The statement in *Trombley* was made only in service of the Court's holding that the privilege had no applicability "to a school board grievance

decision and associated documents," which bears no relation to gubernatorial functions. *Id.*

Indeed, other cases from the High Court suggest a broader scope to the privilege. In *Herald Ass'n, Inc. v. Dean*, 174 Vt. 350 (2002), the Court concluded that the privilege properly applied, at least to some extent, to the Governor's daily schedule. There is no indication in that case that relevant entries in that schedule were communications directly to or from Governor Dean. Further, the privilege in *Killington, Ltd. v. Lash*, 153 Vt. 628, 631 (1990), was applied, at least in part, to "communications directly to or from the Governor's office," not necessarily the Governor personally.

The ACLU also cites this Court's 2005 decision in *Professional Nurse Service, Inc. v. Smith*, No. 732-12-04 Wncv, 2005 WL 6137459 (Vt. Super. Ct. July 14, 2005) (Katz, J.) in support of its cramped view of the privilege. In that case, the State had invoked both the deliberative process privilege and executive privilege. The Court dismissed executive privilege as follows: "The [*Killington v. Lash*] Court made clear that, while the term 'executive' has been used broadly by some courts to refer to privileges extending beyond the actual 'chief executive,' in Vermont, for purposes of the privilege, 'executive' means 'governor.' Because the disputed memoranda in this case are unrelated to the governor, we agree with Plaintiff that the executive privilege, as recognized in Vermont, does not apply." *Id.* (citations omitted). It is by no means obvious that the Court intended that holding to mean that the Governor had to be directly involved in the communication for executive privilege to apply. The trial court's clear holding was that the communications at issue were "unrelated" to (had no connection with) the Governor. Instead, they involved the agency's own, separate deliberative process. The Court adopted the

deliberative process privilege and ruled that the records were properly withheld under that privilege.[6] In any event, *Professional Nurse Service* is a trial court decision that is not binding here.

More importantly, in 2014, this Court employed the reasoning of *In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) to explain that the privilege can properly extend to communications not directly to or from the Governor. *Browning v. State*, No. 272-5-14 Wncv, 2014 WL 10321350 (Dec. 10, 2014) (Teachout, J.). The Court adopts the relevant reasoning of *Browning* and *In re Sealed Case* for purposes of this case.

In *In re Sealed Case*, the D.C. Circuit Court carefully distinguished the deliberative process privilege from executive privilege (referred to there as the presidential communications privilege), explained in depth why the deliberative process privilege is insufficiently protective in these circumstances, and concluded that "restricting the presidential communications privilege to communications that directly involve the President will 'impede the President's ability to perform his constitutional duty.'" *Id*. at 751 (citation omitted). It held:

> We believe therefore that the public interest is best served by holding that communications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President. Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves. The privilege must also extend to communications authored or received in response to a solicitation by members of a presidential adviser's staff, since in many instances

---

[6] The legislature later eliminated the deliberative process privilege from the reach of 1 V.S.A. § 317(c)(4) the following year. *See* 2005, No. 132 (Adj. Sess.), § 1.

rely on their staff to investigate an issue and formulate the advice to be given to the President.

*Id.* at 751–52.

The idea that the purposes of the privilege could be reasonably served by limiting it to communications directly to or from the Governor is quaint but completely ignores the realities of the modern chief executive and the decision making at stake. The days when Governors, even those in Vermont, were able to function by themselves or with one or two aides, have long since passed.

The Court concludes that the communications at issue here are sufficiently connected to the Governor to provide a basis for the assertion of the privilege. According to Dr. Levine's affidavit, the relevant communications involved high ranking officials acting in an advisory capacity to the Governor on policy matters. That is sufficient.

The ACLU's argument that this assertion of privilege somehow is being applied to mere agency decision making not involving the Governor is belied by Dr. Levine's affidavit. Similarly, its contention that it is being applied to matters involving only the Committee, for which the Governor has no role, simply ignores the Department's independent role in making recommendations to the legislature, policy matters that are not somehow separate from the Governor's legitimate interests and decision making. *See New England Coal. for Energy Efficiency & Env't v. Off. of Governor*, 164 Vt. 337, 341 (1995) (noting the privilege can apply to a broad "range of consultative and decisional responsibilities" of the Governor).

To the extent that the ACLU argues that the legislature's elimination of the deliberative process privilege from 1 V.S.A. § 317(c)(4) implies that the executive privilege should be construed more narrowly than it otherwise might, the Court

disagrees. The privileges have different purposes. The legislature has not attempted to limit the reach of executive privilege, and executive privilege has an independent history and constitutional foundation firmly rooted in the separation of powers. *See Killington, Ltd. v. Lash*, 153 Vt. 628, 636 (1990) ("Federal and state courts have accorded to the chief executive of the nation or of a state a privilege which is 'fundamental to the operation of Government and inextricably rooted in the separation of powers.'" (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)).

The Department has successfully made a *prima facie* showing of executive privilege. The burden then switches to the ACLU to demonstrate that disclosure nevertheless should be ordered, or at least *in camera* review preliminary to disclosure should be ordered. The allegations of the complaint are not calculated to analyze that burden, nor need it have done so. The matter cannot reasonably be addressed under Rule 12(b)(6).

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted, in part, and denied, in part, as follows:

(a)     The OML claim predicated on alleged improper Committee decision making undertaken unilaterally by Commissioner Levine after the Committee's December 22 meeting is dismissed. The other OML claims remain in the case vis-à-vis the Committee. As to the other defendants, those claims are dismissed.

(b)     The Department has made a *prima facie* showing of executive privilege for purposes of the ACLU's PRA claim. Going forward, the ACLU will have the burden of rebutting the presumption of privilege.

(c)     Counsel shall confer and suggest a proposed schedule/approach to resolving the remaining issues. in the case within 21 days.

Electronically signed on May 5, 2025, per V.R.E.F. 9(d).

_____
Timothy B. Tomasi
Superior Court Judge